**In re Theodore B. OLSON.**

**Div. No. 86–1.**

United States Court of Appeals, District of Columbia Circuit.

(Division for the Purpose of Appointing Independent Counsels Ethics in Government Act of 1978, as Amended).

Sept. 8, 1989.

As Amended Sept. 8, 1989.

**1418**

Before MacKINNON, Presiding, BUTZNER and PELL, Senior Circuit Judges.

## PER CURIAM.

Theodore B. Olson, as Assistant Attorney General, Office of Legal Counsel, was caught up in a separation of powers contest between the Congress and the Executive Branch and subjected, by an Independent Counsel appointed pursuant to 28 U.S.C. § 591 *et seq.*, to a protracted investigation into the truthfulness of his Congressional testimony. Along the way, the Supreme Court ruled on the constitutionality of the Independent Counsel provision of the Ethics in Government Act. *Morrison v. Olson*, —— U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). The Independent Counsel exonerated Olson of any offense and, as authorized by 28 U.S.C. § 593(f) of the Ethics in Government Act, he petitions the Special Division of the court to award him $1,259,072.69 in compensation for the attorneys' fees he incurred. We order an award of $861,589.28 in reasonable attorneys' fees and expenses.

## I. "BUT FOR" ANALYSIS

 The statute provides that "the division of the court *may*, if no indictment is brought ... award reimbursement for those reasonable attorney's fees incurred ... during that investigation which would not have been incurred *but for* the requirements of this chapter...." 28 U.S.C. § 593(f)(1) (emphasis added). If the "but for" requirement is satisfied the court is called upon to exercise its judicial discretion in awarding reasonable attorneys' fees. As the Senate Report states:

> The court should award only that portion of the fees, if any, which it determines would not have been incurred in the absence of the special prosecutor law.

S.Rep. 97–496, 97th Cong., 2d Sess. 18 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3537, 3554. The "but for" requirement and the standard of reasonableness for attorneys' fees are discussed where relevant in the following analysis.

Our opinion in *In Re Donovan*, 877 F.2d 982, 984–986 Div. No. 85–1 at 1–5 (D.C.Cir. 1989), outlines the history of the 1978 Ethics in Government Act[1] and its progeny.[2] The premise from which the Ethics Act springs is that the Department of Justice cannot, and cannot be perceived to, conduct a full and impartial investigation of allegations of criminal wrongdoing by high Executive Branch officials in the same administration that controls the Department of Justice.[3] The Independent Counsel Act seeks to remedy the problem by providing a mechanism through which an investigation into allegations of criminal misconduct by high officials in the Executive Branch may be conducted in major respects "separate from and independent of the Department of Justice...." 28 U.S.C. § 594(i).

In the 1982 Act, Congress first authorized the payment of attorneys' fees incurred by unindicted subjects of independent counsel investigations where, under normal Justice Department procedures, the subject would not have incurred such fees.

The 1982 remedial amendments provided, with some notable exceptions,[4] that an in-

---

1. Ethics in Government Act of 1978, P.L. No. 95–521, 92 Stat. 1824 (1978).

2. Ethics in Government Act Amendments of 1982, P.L. 97–409, 96 Stat. 2039 (1983) (The Act was signed into law on January 3, 1983.); the Independent Counsel Reauthorization Act of 1987, *supra.* Each Act has had a five year sunset provision.

3. *See* Ethics in Government Act of 1978, *supra,* S.Rep. No. 170, 95th Cong., 1st Sess., 6 (1977), U.S.Code Cong. & Admin.News 1978, p. 4216; Ethics in Government Act Amendments of 1982, *supra,* S.Rep. 496, 97th Cong., 2d Sess., 2 (1982); Independent Counsel Reauthorization Act of

1987, *supra,* H.R.Rep. 316, 100th Cong., 1st Sess., 11 (1987).

4. *See In Re Donovan, supra,* at 988–990. Donovan's application met the "but for" requirement because § 592(a)(2) of the Act prevented the Department of Justice from convening grand juries, granting immunity, issuing subpoenas or plea bargaining. These restrictions prevented the Department of Justice from determining at an early stage in the investigation that the principal witness lacked credibility—the Independent Counsel later made such determination. The Deputy Attorney General's application for appointment of an independent counsel cited

dependent counsel investigation should not commence where an ordinary Justice Department investigation would not be initiated,[5] and that an unindicted subject of an independent counsel investigation may recover the reasonable attorneys' fees which he would not have incurred "but for" the operation of the Act.

### A. The Attorney General's Preliminary Investigation

Petitioner requests reimbursement for "Preliminary Investigation (Jenner & Block)—$30,028.34." This request is for attorneys' fees at his attorneys' "C" rate incurred for representation "during the preliminary investigation [January 2, 1986 —April 22, 1986] conducted by the Department of Justice...." *Petition* at p. 18. This phase of the investigation followed the Department's receipt of a request from the Judiciary Committee of the House of Representatives and preceded the Attorney General's decision to request the Special Division of the court to appoint an independent counsel and define jurisdiction.

■ The evaluation of the fee petition by the Attorney General opposes petitioner's request for fees incurred during this period. We agree. As the Senate Report states: "The bill does not authorize reimbursement for expenses incurred during the preliminary investigation...." S.Rep. 97–496, *supra*, at 18, U.S.Code Cong. & Admin.News 1982, p. 3554. The statute is also specific on this point. As set forth above, it provides that: "an individual who

is the *subject of an investigation conducted by an independent counsel* ... may [be] award[ed] reimbursement for those reasonable attorneys' *fees incurred by that individual during that investigation....*" 28 U.S.C. § 593(f)(1) (emphasis added).

Moreover, this "preliminary" phase of the investigation would not satisfy the "but for" requirement. Given the accusation, any person would have been investigated. As it turned out, the investigation at this incomplete stage produced ample support for the appointment of an independent counsel from the Public Integrity Section of the Department of Justice, two separate evaluations prepared independently by two highly experienced lawyers in the Department (one a highly qualified United States attorney on temporary assignment for the purpose), and the Judiciary Committee of the House of Representatives. The reports of all three analyses within the Department of Justice recommended that the Attorney General apply for the appointment of independent counsel to investigate some of the allegations against Olson as set forth in the House Report.

We thus reject this part of the petition. The fees were not "incurred ... during [the] investigation ... conducted by an independent counsel." *Id.*

### B. The Independent Counsel Investigation

The remainder of the fees for which reimbursement is requested total $1,229,-

---

the foregoing provision as precluding the Department from conducting an effective preliminary investigation into whether the allegations against Donovan merited an appointment. Had the Justice Department possessed the authority to convene a grand jury and grant immunity, the Department would have quickly closed the matter.

5. The central thrust of the 1982 amendments was to establish an independent counsel process that did not penalize high government officials by subjecting them to a hair trigger standard for the commencement of a criminal investigation and appointment of an independent counsel. The Senate Report, *supra*, accompanying the 1982 amendments stated:

The change S. 2059 [the 1982 amendments] makes in the standards which trigger a pre-

liminary investigation and an appointment of a special prosecutor are designed to ensure that covered officials will not be subjected to a more rigorous application of the criminal law than is applied to other citizens.
S.Rep. 97–496 at 19, U.S.Code Cong. & Admin. News 1982, p. 3555.

The congressional intent that high government officials and ordinary citizens be subject to a uniform standard when the government determines whether to pursue prosecution was reaffirmed in the Independent Counsel Reauthorization Act, *supra*. "The statute as amended [in 1982] now ensures that government officials covered by the independent counsel process are subjected to the same standards as everyone else." H.R.Rep. 100–452 at 31, U.S.Code Cong. & Admin.News 1987, p. 2197.

044.35. Such fees were incurred during four separate periods.

### 1. The Initial Investigation by Independent Counsel

In the *First* period (April 23, 1986 to November 14, 1986) the Attorney General applied for the appointment of independent counsel, such counsel was appointed, the initial investigation followed, and the period ended with the announcement on November 14, 1986 by Independent Counsel of her determination that "standing in isolation ... Mr. Olson's testimony of March 10, 1983, probably does not constitute a prosecutable violation of any federal criminal law...." Letter from Independent Counsel to Attorney General Meese (Nov. 14, 1986) at 3.

■ The greater portion of her investigation necessarily *duplicated* ground that had been covered by the preliminary investigation of the Department of Justice that had been based on the exhaustive investigation outlined in the Report of the Judiciary Committee of the House of Representatives. The 1982 Senate Committee Report on the Ethics in Government Act considered such situations and stated:

> Thus, the Committee believes that reimbursement of attorneys' fees would be warranted, if at all, in only rare instances. This amendment is included, however, as a safeguard to compensate officials in the event that they do incur *extraordinary expenses* during a special prosecutor investigation which eventually absolves them of any wrong doing. Reimbursement may be warranted, for example, in instances where the special prosecutor *duplicates* actions which have been taken by the Attorney General during the preliminary investigation. The Committee stresses, however, that the court should award attorneys' fees sparingly, and that reimbursement should not become a routine event.

**6.** Appointment of an independent counsel is requested to pursue the question whether Mr. Olson's testimony on March 10, 1983, and his revisions of such testimony, violated either of these statutes or *any other provision of federal criminal law.*

S.Rep. 97–496, P.L. 97–409, July 14, 1982, p. 19, U.S.Code Cong. & Admin.News 1982, p. 3555 (emphasis added). The court is admonished to award reimbursement for attorneys' fees "in only rare instances" for "extraordinary expenses," "sparingly," and duplication by the Independent Counsel of "actions ... taken by the Attorney General during the preliminary investigation" is given as one instance where "[r]eimbursement may be warranted." *Id.* We thus conclude it is the expressed intent of Congress that "reasonable" attorneys' fees incurred by Olson during this period satisfy the "but for" requirement and are compensable.

### 2. The Request by Independent Counsel for Expanded Jurisdiction

The *Second* period (November 14, 1986 until April 2, 1987) encompassed the request by Independent Counsel for expanded jurisdiction to investigate others in the Department of Justice, primarily on conspiracy charges. It ended on April 2, 1987 in the decision by the Special Division of the court refusing to authorize the additional jurisdiction. *In re Olson*, 818 F.2d 34, 47 (D.C.Cir.1987). The court's opinion also pointed out that the defined jurisdiction of Independent Counsel authorized her to investigate *Olson's* participation in any conspiracy which violated "any federal criminal law." *Id.* at 47. The Attorney General's application had requested the court to so define the jurisdiction of Independent Counsel.[6]

■ This period was devoted exclusively to the successful opposition by Olson's attorneys to the request by Independent Counsel for expansion of her prosecutorial authority. We find for this period that the "but for" requirement is clearly satisfied. The Attorney General initially denied the request, except as to Robert M. Perry, General Counsel of the Environmental Protec-

Application of Attorney General Edwin Meese III, Div. No. 86–1, p. 11, April 10, 1986 (emphasis added).

tion Agency,[7] on the ground that he had already considered and denied the principal request as to Edward Schmults, former Deputy Attorney General, and Carol Dinkins, former Assistant Attorney General. The Independent Counsel then applied to the Special Division for the expansion of the authority that had been denied her by the Attorney General. The court ruled that, under the statute, the Attorney General's prior decision denying further investigative authority in the matter left "the division of the court [with] no power to appoint a[n] independent counsel." 28 U.S.C. § 592(b)(1) (1983). Thus, having once been denied by the Attorney General, it is clear that no fees for opposing the independent counsel's request for expanded jurisdiction would have been incurred "but for" the Act.

### 3. Constitutional Litigation in the Supreme Court

The *Third* period (April 2, 1987 to June 29, 1988) covers counsel's activity from the decision in *In re Olson, supra,* until the Supreme Court announced its decision in *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). During this period the attempt by Independent Counsel to subpoena Olson, Schmults and Dinkins in her investigation of a possible conspiracy with others to obstruct the congressional hearing was resisted by Olson who filed an action alleging that the Act violated the separation of powers doctrine of the Constitution. The constitutionality of the Independent Counsel statute was thus challenged, but subsequently upheld by the Supreme Court reversing the decision of the Court of Appeals. *See In re Sealed Case,* 838 F.2d 476 (D.C.Cir.1988).

■ Legal services during this period uniquely satisfy the "but for" requirement, being devoted almost exclusively to the constitutional challenge to the Act.[8] The Attorney General's evaluation reaches the same conclusion. As Olson's petition points out, this test could have been avoided by Independent Counsel accepting a parallel appointment by the Attorney General, but she based her refusal to accede to such request on the ground, subsequently upheld, that placing herself "under the control of the Department [of Justice]" would directly conflict with the intent of the Act.[9] The whole purpose of the Independent Counsel Act was to separate Independent Counsel from control by the Department of Justice and the statute had been so interpreted by the Department of Justice since its enactment.[10]

### 4. The Concluding Investigation and Final Report

■ The *Fourth* period (June 29, 1988 to February 21, 1989) following the decision in *Morrison v. Olson, supra,* encompasses Independent Counsel's investigation by interviews and grand jury proceedings, the filing by Independent Counsel of her Final Report, and Olson's submission of his comments thereto on February 21, 1989. We have previously held that attorneys' fees incurred by the subject of an investigation in the preparation of comments to the Report are reimbursable where they are reasonably related to the substantive defense.

---

**7.** No fees were incurred by Olson in connection with the Perry matter.

**8.** Petitioner asserts that the application for appointment of Independent Counsel by the Attorney General had an alleged "single focus" on Olson's March, 1983 testimony, but, as set forth in n. 6, applications by the Attorney General for the appointment of Independent Counsel customarily request the court to define the investigatory jurisdiction to include "any violation of federal criminal law."

**9.** Letter of Independent Counsel Alexia Morrison to Arnold I. Burns, Deputy Attorney General, of August 31, 1987 at 4.

**10.** "The special prosecutor is an independent entity within the Executive branch and is not a part of any existing Department or agency...." Opinion of John M. Harmon, Assistant Attorney General, Office of Legal Counsel for the Associate Deputy Attorney General, March 30, 1979, delivered to Presiding Judge, Honorable Roger Robb by Benjamin R. Civiletti, Deputy Attorney General, in response to request for "analysis of the Act's conflict-of-interest requirements and their potential effect on persons you may seek to appoint as special prosecutors." All counsel appointed pursuant to the Act were given copies of this Department of Justice opinion at the outset of their service.

The statute specifically provides for such comments. *See In re Donovan, supra,* at 994.

In addition, during this period inquiry into Schmults' and Dinkins' possible conspiratorial relationship with Olson was pursued with negative results. Since the Attorney General had initially reached the conclusion that no conspiracy existed, this phase of the investigation was duplicative and, for that reason, satisfies the "but for" requirement. We also take note of the fact that Independent Counsel had concluded as early as November 14, 1986 that Olson's testimony "standing in isolation probably did not constitute a prosecutable violation of any federal criminal law...."[11] This statement indicates that attorneys' fees incurred in defense of any *subsequent* investigation into the charge that alleged false statements by Olson obstructed Congress satisfies the "but for" requirement.

## II. THE REASONABLE FEE REQUIREMENT

██ Having found that some of the fees were incurred by Olson under circumstances that satisfy the "but for" requirement, the court must now ascertain what portion of such fees were reasonably incurred and thus qualify for a compensation award. In evaluating the reasonableness of a fee request, the court must focus on two questions: 1) Whether the attorneys charged a reasonable hourly rate. 2) Whether the applicant has sustained the burden of proving that the amount of time expended by the attorneys on the case was reasonable, *i.e.,* can the court conclude from the application that the services were efficient, devoted to necessary subjects and not excessive in the amount of hours logged on the case. *See In Re Donovan* at 990.

Olson was represented by lawyers from the Washington, D.C. office of Jenner & Block. Olson's principal attorneys at the firm were Thomas S. Martin, David E. Zerhusen, David W. DeBruin and Anthony C. Epstein; several other Jenner & Block attorneys, law clerks, paralegals and support staff logged time on the case. Additionally Jenner & Block retained James F. Neal of Nashville, Tennessee during the last stage of the Independent Counsel's investigation following the Supreme Court's decision in *Morrison v. Olson, supra.* Olson seeks an award of compensation for the following:

| | |
|---|---|
| Preliminary Investigation (Jenner & Block)— | $30,028.34 |
| Morrison Investigation (Jenner & Block)— | $1,214,198.00 |
| Morrison Investigation (Neal & Harwell)— | $14,846.35 |
| TOTAL— | $1,259,072.69 |

In support of the fee application, Olson submits affidavits of many of his attorneys as well as the affidavit of Irvin B. Nathan of the Washington Bar, and other exhibits: attorneys' time sheets, affidavits of various individuals who worked on Olson's behalf during the investigation, and an elaborate memorandum Jenner & Block submitted to the Independent Counsel.

Under Section 593(f)(1), the court is vested with discretion to award attorneys' fees *i.e.*—"the division of the court may ... award reimbursement for those reasonable attorneys' fees incurred...." Congress has provided the court with some guidance for the exercise of our discretion. This House Report states:

> In determining the proper [hourly] rate, the special court should consider the prevailing community standards and any helpful case law.... [T]he special court should pay particular attention to the reasonableness of the underlying items.... Attention should also be paid to the number of hours claimed for performing particular services ...

H.Rep. No. 452, 100th Cong., 1st Sess. 31 (1987), U.S.Code Cong. & Admin.News 1987, p. 2197.

██ We construe "incurred" to refer to "actual fees which the subject has paid or for which he is liable." *In re Donovan* at 991. In determining whether a fee is reasonable we look to the specific require-

---

11. Letter of Independent Counsel to Attorney General, November 14, 1986. *See* In re Olson,

818 F.2d 34, 38 (D.C.Cir.1987).

ments of the Act and general case law as to what constitutes a reasonable fee.[12]

In *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Court, citing its decision in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and the legislative history of the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988, "concluded that the 'product of reasonable hours times a reasonable rate' normally provides a 'reasonable' attorney's fee within the meaning of the statute [§ 1988]." *Blum,* 465 U.S. at 887, 104 S.Ct. at 1543 (quoting *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939).

This Circuit has summarized the *Blum* formulation as constituting a three part analysis: "(1) determination of the number of hours reasonably expended in litigation; (2) determination of a reasonable hourly rate . . .; (3) the use of multipliers as merited." *Save Our Cumberland Mountains Inc. v. Hodel,* 857 F.2d 1516, 1517 (D.C.Cir. 1988) (*en banc*). The use of multipliers for exceptional cases, attorneys and results, etc., especially in attempting to recover fees from the government, is not countenanced in most cases and a party's recovery is typically limited to a reasonable lodestar figure. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).[13]

### A. Hourly Rates

Olson's attorneys, Jenner & Block, have requested hourly rates which are some-

what higher than the firm's normal rates for attorneys' services. In addition, the firm charged "market" rates for some support staff functions—*i.e.,* clerical and library personnel. " '[R]easonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. at 895, 104 S.Ct. at 1547. *See also Bebchick v. Washington Metropolitan Area Transit Com'n,* 805 F.2d 396, 402 (D.C.Cir. 1986); *Jordan v. Multnomah County,* 815 F.2d 1258, 1262 (9th Cir.1987). Noting the "inherent[ ] difficult[y]" in determining the prevailing community rate, the *Blum* Court held:

> In seeking some basis for a standard, courts properly have required prevailing attorneys to justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the [fee] applicant to produce satisfactory evidence—in addition to the attorney's own affidavit—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

*Blum* 465 U.S. at 895–96 n. 11, 104 S.Ct. at 1547 n. 11.

 In the instant case, as support for the application, Olson has provided the affidavit of competent local counsel stating that he reviewed Jenner & Block's partner and associate fees and found them to be "consistent" with the fee schedule at Arnold & Porter. Nathan Affidavit at 3–4.[14]

---

12. In Pennsylvania v. Delaware Valley Citizens' Council For Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), the Supreme Court stated:

> There are over 100 separate statutes providing for the awarding of attorneys' fees; and although these provisions cover a wide variety of contexts and causes of action, the benchmark for the awards under nearly all these statutes is that the attorney's fee must be "reasonable."

*Id.* at 562, 106 S.Ct. at 3096, *see also* In re Donovan at 991.

13. The lodestar amount is the product of the number of hours reasonably expended in a representation and a reasonable hourly rate. The

lodestar analysis was developed by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir.1973).

14. The fee application also contains an affidavit of James F. Neal which appears to be offered, at least in part, as support for the reasonableness of the fees charged by Jenner & Block. Neal Affidavit at 4–5. Neal was retained by Olson in the latter stage of the Independent Counsel's investigation. Since Neal was retained in the case, we cannot, despite his well known national experience, credit his affidavit as helping to discharge Olson's burden of demonstrating through *independent evidence* that the fees charged were reasonable. In *Blum,* as quoted

Jenner & Block attorney rates in the main ranged from $75 per hour to $220 per hour.[15]

 We find fault with Jenner & Block's practice of billing Olson at its premium "C" rate as opposed to its normal "A" rate. The "C" rate ranged from $5–$20 higher per hour than the "A" rate. The firm seeks to justify this billing practice on two grounds. First, Jenner & Block asserts that Olson was billed at the "C" rate because "he was unable to meet his financial obligations to the firm on a basis consistent with the firm's normal requirements...." Martin Affidavit at 6. Second, the "C" rate compensated for the "necessarily ... significant delay" in payment. *Id.* The "A" rate is the normal rate charged on all matters where billing occurs monthly and for which payment can be expected within 30 days of billing.

Olson, having been billed by Jenner & Block at the "C" rate, now requests that the government pay him for fees incurred at that rate. In accordance with the retainer agreement, Olson has advanced over $30,000, at the rate of $1,000.00 per month, for expenses incurred in his defense but he has not made any other payment for attorneys' fees. In fact, the retainer agreement did not contemplate that attorneys' fees would be paid until the investigation was completed and Independent Counsel had made her Final Report. Under such circumstances, for reasons discussed later, we conclude that any award to be paid by the United States for attorneys' fees must be based upon the "A" rate and the award ordered is so computed.

### 1. Contingency

The first ground for the higher "C" rate appears, on analysis, to be a contingency fee argument. The basis for the contention is that Jenner & Block relied on Olson's inability to meet his financial obligations to the firm and agreed to "accept *any* resulting court award as full and complete satisfaction of your obligation to the firm...." Retainer Agreement at 1 (emphasis added). The firm contends it assumed a risk of nonpayment if Olson had been indicted and thus became ineligible for reimbursement under the Act. The terms of the Olson–Jenner & Block retainer agreement, however, belie this contention. While the fee agreement does provide that Jenner & Block will accept any fee award this court makes pursuant to the Act as "complete and full satisfaction" of Olson's obligations for fees arising under the covered period, the fee agreement plainly states that Olson is liable for fees incurred where:

(a) Independent Counsel brings an indictment against him;

(b) the court refuses to award fees; or

(c) fees are incurred on your behalf outside the time period covered by a § 593(g) award.

Retainer Agreement at 1–2.

The Supreme Court has recently held that a risk of nonpayment is not present where an attorney preserves a right of recourse against a client for unpaid fees. In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), the Court found that "when the plaintiff has agreed to pay its attorney, win or lose, the attorney has not assumed the risk of non-

above, the Court clearly stated that a fee applicant must "produce satisfactory evidence—*in addition to the attorney's own affidavits*—that the requested rates are in line with those prevailing in the community...." *Blum* 465 U.S. at 895–96, n. 11, 104 S.Ct. at 1547 n. 11.

Also, there are no independent affidavits supporting the reasonableness of Neal's rates. Such a defect would ordinarily foreclose the possibility of reimbursement. However, the court takes *judicial notice, pursuant to Federal Rule of Evidence 201,* that Neal's billing rate of $260 per hour constitutes a reasonable rate for

his legal services. *Fed.R.Evid.* 201(c) and (f). Neal's legal abilities are generally well known within this Circuit. He was the special prosecutor in the principal Watergate Case, served as Chief Counsel in the Senate Select Committee to Study Undercover Operations of the Department of Justice, as a Justice Department attorney he successfully prosecuted James Hoffa, and later served as United States Attorney in Tennessee.

15. The services of two attorneys are billed at higher hourly rates but they only billed a few hours—mostly advisory.

payment and there is no occasion to adjust the lodestar fee because the case was a risky one." *Id.* at 716, 107 S.Ct. at 3082 (citing *Jones v. Central Soya Co.,* 748 F.2d 586, 593 (11th Cir.1984) ("A lawyer may not preserve a right of recourse against his client for fees and still expect to be compensated as if he had sacrificed completely his right to payment in the event of an unsuccessful outcome.").

In the instant case, Jenner & Block has not renounced its right to payment from Olson, but rather has entered into a carefully drafted contract designed to preserve its rights to payment no matter what the outcome. Under the fee agreement, Jenner & Block would collect its fees from the United States in the event that Olson qualified for reimbursement under § 593(f)—with Olson still liable for any fees the court determined to be outside the scope of the Act—or Jenner & Block would collect its fees from Olson in the event that Olson was not eligible for reimbursement under the Act. The foregoing indicates that Jenner & Block had not "assumed the risk of nonpayment" and thus there "is no occasion to adjust the lodestar" for a contingency enhancement.[16]

### 2. Anticipated Delay in Receiving Payment

Jenner & Block asserts that the anticipated delay in receiving payment is a second factor justifying its billing Olson at a higher than normal rate. The Supreme Court, however, has found that a fee enhancement based on delay is equivalent to recovering prejudgment interest which is generally prohibited in claims against the United States absent an express congressional waiver. In our view, this rule applies not only to explicit interest but also where compensation for delay is an implicit component.

The government's no-interest rule is of long standing. "The no-interest rule is expressly described as early as 1819, in an opinion letter [of] the Attorney General...." *Library of Congress v. Shaw,* 478 U.S. 310, 316, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1986). Many earlier cases state the same rule. *Angarica v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 1160–61, 32 L.Ed. 159 (1888) ("[It is a] well-settled principle that the United States are not liable to pay interest on claims against them, in the absence of express statutory provisions to that effect."). *Tillson v. United States,* 100 U.S. 43, 47, 25 L.Ed. 543 (1879) ("[I]nterest is recoverable between citizens if a payment of money is unreasonably delayed [but] with the government the rule is different, and ... the practice has long prevailed in the departments of not allowing interest on claims presented, except in some way specifically provided for.") (citing earlier cases).

The Court has most recently stated the rule as follows:

> Interest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money. The no-interest rule has been applied to prevent parties from holding the United States liable on claims grounded on the belated receipt of funds, even when characterized as compensation for delay.

*Library of Congress v. Shaw, supra,* 478 U.S. at 322, 106 S.Ct. at 2965 (1986) (citing *United States v. Sherman,* 98 U.S. 565, 568, 25 L.Ed. 235 (1879). Interest may only be recovered from the United States where "the award of interest was *affirmatively and separately contemplated by Congress.*" *Id.* 478 U.S. at 315, 106 S.Ct. at 2961–62 (emphasis added) (citing *Angarica v. Bayard,* 127 U.S. 251, 260, 32 L.Ed. 159 (1888). *Accord Missouri v. Jenkins,* ——

---

**16.** Had the Olson fee agreement called for a true contingency arrangement, there would have been serious questions as to the compensability of such fees. Section 593 states that a subject may only seek reimbursement for fees "incurred" during an independent counsel investigation. This court has interpreted incurred as

"requir[ing] that the *subject be legally liable* for the fees...." In re Donovan at 992–93 (emphasis added). When a client enters a true contingency fee retainer agreement he is not liable for legal fees in the event of an unsuccessful outcome.

U.S. ——, ——, 109 S.Ct. 2463, 2467–68, 105 L.Ed.2d 229 (1989).

In applying these rules to the Title VII case at bar, the *Shaw* Court stated:

> [W]e [do not] find the requisite waiver of immunity from interest in the statutory requirement of awarding "reasonable" attorney's fees. There is no basis for reading the term "reasonable" as the embodiment of a specific congressional choice to include interest as a component of attorney's fees, particularly where the legislative history is silent.

*Shaw* 478 U.S. at 320, 106 S.Ct. at 2964. The instant case closely parallels *Shaw* because § 593(f) merely provides for the award of "reasonable" attorneys' fees in the appropriate case and the legislative history is silent on the question of awarding interest. Accordingly, there is *no basis* to assert that Congress in the Independent Counsel Act even contemplated waiving the no-interest rule, much less took affirmative steps to so act.

We thus hold that Jenner & Block may not recover its enhanced "C" rate. Rather, it must apply its hourly rate in its claim against the United States at its normal "A" level. This result is particularly appropriate since the retainer agreement contemplated that fees would not be currently paid beyond the $1,000 per month to be paid by Olson, that the United States would be looked to as the ultimate payee, and that "any resulting court award [will be accepted] as full and complete satisfaction of [Olson's] obligation...."

When all the circumstances are considered, it is obvious that the retainer agreement was deeply predicated upon the anticipation that the United States would eventually pay Olson's attorneys' fees pursuant to a court award under the Act.[17] In such circumstances, to permit the parties to *agree in advance* that the United States should be required to pay a fee based on implicit interest for delay would be allowing indirectly what could not be done directly.

### 3. Law Clerks, Paralegals, and Staff

The fee application also requests reimbursement for work done by law clerks and paralegals at their market rates. The Nathan affidavit supports the reasonableness of the requested rates as being in line with prevailing community rates. Nathan Affidavit at 4. This Circuit "holds that paralegals and law clerks are to be compensated at their market rates." *In re Donovan* at 992–993 n. 20 (citations omitted).

Recently, in *Missouri v. Jenkins*, —— U.S. ——, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), the Supreme Court ruled that a State, as a defendant in a successful 42 U.S.C. § 1988 action, was required to pay the market rate of law clerks and paralegals in an award of reasonable attorneys' fees. The Court found that the relevant inquiry in determining what constitutes a reasonable attorneys' fee is a "calculat[ion] on the basis of rates and practices prevailing in the relevant market...." *Id.* at ——, 109 S.Ct. at 2470–72. We find that the rates Jenner & Block billed for law clerks and paralegals comported with community practice.

The court, however, disallows Jenner & Block's asserted market rate billing for work done by librarians, clerical personnel and other support staff. There is nothing in the Act or its legislative history indicating that Congress intended to in-

---

**17.** The retainer agreement provides:

> 2. Jenner & Block will not expect payment from you on these bills prior to the Independent Counsel's decision to either (a) dismiss the action or (b) return an indictment.
>
> 3. Should Independent Counsel dismiss or otherwise terminate this action prior to an indictment, Jenner & Block will seek to recover from the appropriate court those attorneys' fees allowable under 28 U.S.C. § 593(g). Jenner & Block will accept any resulting court award as full and complete satisfaction of

your obligations to the firm arising during the time period for which the award covers.

With respect to Olson's required $1,000 monthly payments the agreement provides:

> 5. You will make $1,000.00 monthly payments to Jenner & Block commencing May 1, 1987. Those payments will be applied against disbursements as incurred, and then against your fees currently outstanding. These payments will be refunded in full upon receipt by Jenner & Block of any court award of fees pursuant to paragraph 3 of this letter.

clude such billings in an award of "attorneys' fees." Such services are generally considered within the overhead component of a lawyer's fee. We need not, however, reach that question here because the fee application fails to adequately document that such fees are "in line" with community practice as required by *Blum v. Stenson, supra,* 465 U.S. at n. 11, 104 S.Ct. at n. 11.[18]

### B. Reasonable Amount of Time Expended by Attorneys

■ In considering the reasonableness of the hours billed, we first examine the fee application in view of the specific provisions of the Act "to determine whether the fees charged were incurred during the independent counsel investigation and were reasonably related to a defense to such investigation." *In re Donovan* at 993.

■ We shall exclude from Olson's award hours logged preparing the fee application since we interpret § 593(f) as prohibiting the award of fees for that purpose. Although the Act provides for the possibility of recovery of fees incurred through submission of a fee application, we do not consider that *preparation* of such application is an "extraordinary expense" for which the Congress intended the United States should be obligated. H.Rep. No. 452, 100th Cong., 1st Sess. 31 (1987), U.S. Code Cong. & Admin.News 1987, p. 2197.[19] It is not an "extraordinary" event for a lawyer to be required to prepare a petition for his fees and expenses particularly when they exceed $1,000,000.00.

Also, fees incurred for preparation of the fee application, in our analysis of congressional intent, were not "incurred ... *during* [the independent counsel's] investigation" in the sense that Congress indicated in § 593(f)(1) that attorneys' fees were to be compensated by the United States. (Emphasis added.). We interpret the limiting provision, "during the investigation" in § 593(f)(1) to refer to attorneys' services rendered in asserting the *merits* of the subject's defense against the criminal charges being investigated. Thus, the fees incurred in preparation of the fee application were not "reasonably related to a *defense* to ... [the Independent Counsel's] investigation." *In re Donovan* at 993 (emphasis added).[20] This is a close question,

---

**18.** The only arguably independent support demonstrating that charging market rates for a firm's non-legal support personnel is community practice is a passing statement in the Nathan affidavit which contends that Jenner & Block's clerical staff rates are comparable to "those charged by Arnold & Porter." Nathan Affidavit at 4. We find, however, that the isolated billing practice of two law firms in Washington, D.C. do not, a community practice, make. The fee application does not attempt to document that market rate billing for support staff is common among the area law firms. Moreover, our experience with past fee petitions has indicated that such billing practice is not common.

**19.** As we interpret the statute and its legislative history, Congress indicated that it only contemplated paying compensation for fees incurred *in defending* the target from the independent counsel's substantive investigation. In 1982, Congress stated that the court, if the subject meets other statutory conditions, may award fees which "would not have been incurred by a private citizen in an *investigation* of the same allegations." S.Rep. No. 409, 97th Cong., 1st Sess., 18 (1982), U.S.Code Cong. & Admin.News 1982, p. 3554 (emphasis added). This language indicates that Congress was focusing on compensating only for fees incurred in a substantive, "on the merits" defense against the investigation.

This intent is underscored by the inclusion in the Committee Report of testimony given by Lloyd Cutler on the need for a reimbursement provision in the Act. Cutler stated, *inter alia:*

We should not excuse or relieve a public official of the cost of *defending* himself that any other person would be subjected to.... I don't want to suggest that government officials are indigent, but their salaries in proportion to the costs of counsel of the quality necessary to *defend* them in cases of the type that are brought against a high public official come very, very close to that.

*Id.* at 991–92 (emphasis added). Cutler's testimony on the need for compensating high officials for the cost of defending against an independent counsel investigation is clearly directed at an on the merits defense, not the fees incurred for a collateral fee application. Therefore, we find that the Olson request for fees incurred in preparation of the fee application is outside the scope of reimbursement that Congress intended.

**20.** As in *Donovan,* we shall permit Olson to recover reasonable attorneys' fees incurred in the preparation of comments to the Independent Counsel's Final Report. As noted *supra,* at 988, although Olson incurred these fees after the Independent Counsel's investigation terminated,

but since any waiver of sovereign immunity must be strictly construed, we resolve the question in favor of no recovery for the time spent in preparing the petition and memorandum. *See United States v. Mottaz,* 476 U.S. 834, 851, 106 S.Ct. 2224, 2234, 90 L.Ed.2d 841 (1986) ("[A] waiver of sovereign immunity cannot be lightly implied....") (citations omitted); *Lehman v. Nakshian,* 453 U.S. 156, 161, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981) ("[T]his Court has long decided that limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.") (citations omitted); *United States v. Kubrick,* 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979) ("[W]e should not take it upon ourselves to extend the waiver [of sovereign immunity] beyond that which Congress intended."); *In re Donovan,* at 994–995 (D.C.Cir.1989) ("We must strictly construe waivers of sovereign immunity."); *In re Jordan,* 745 F.2d 1574, 1576 (D.C.Cir.1984) ("Waivers of sovereign immunity must be strictly construed.").

■ We next examine the fee application "in light of general case law on what constitutes hours reasonably incurred." *Blum v. Stenson, supra.* In this connection we require that the applicant submit "contemporaneous time records of hours worked and rates claimed" which sufficiently document the services rendered and prove their reasonableness. *In re Donovan* at 994 (citations omitted); *see also Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (Where "documentation of hours is inadequate, the ... court may reduce the award accordingly.... [Additionally, the court should] exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary...."); *United States Tile & Composition v. G & M Roofing,* 732 F.2d 495, 502, n. 2 (6th Cir.1984) (Supporting documentation "must be of sufficient detail and probative value to enable the court to determine *with a high degree of certainty* that such hours were actually and *reasonably expended....*") (emphasis added).

■ Examination of the application reveals numerous instances where the billing entries were not adequately documented. This defect in adequate record keeping is most prevalent among the lawyers billing at the highest rates. For example, there are multitudinous billing entries, included among other entries for a particular day, that wholly fail to state, or to make any reference to the subject discussed at a conference, meeting or telephone conference. Some examples of imprecise documentation are set forth in the margin.[21] Such deficient specifications make it impossible for the court to determine, with any degree of exactitude, the amount of time billed for a discreet activity where the lawyer in question billed for more than one activity in a day. The time sheets were itemized on a daily basis, not by the task. Thus, when an attorney billed for more than one task in a day, the court is left to approximate the amount of time which should be allocated to each task. With such inadequate de-

such fees were incurred as part of Olson's substantive defense to the investigation. Olson had the statutory right to comment on the Report in order to protect his reputation pursuant to § 594(h)(2) of the Act. *See generally,* In re Sealed Motion, 880 F.2d 1367 (D.C.Cir.1989).

21. "Discussions with Zerhusen"; "telephone conferences with Zerhusen"; "meeting with Zerhusen" (11 entries); "meeting with Zerhusen and D. DeBruin" (4 entries); "meetings re: strategy"; "calls to Dave Zerhusen"; "telephone conferences"; "conference with T. Martin" (42 entries); "in-house conference with T. Martin"; "meetings with DeBruin and Martin" (19 entries); "telephone conversation with J. Bales"; "conference with D. DeBruin" (5 entries); "conference with J. Nolan"; "telephone conversation with T. Martin" (4 entries); "conferences with T. Martin and A. Epstein"; "discussions with T. Martin, Epstein and DeBruin"; "conferences with A. Epstein," "meetings with A. Epstein and T. Martin"; "telephone conversation with T. Martin"; "conferences with T. Martin"; "conference with S. Miller"; "telephone conferences with ... re: various matters" (40 entries); "met with T. Sullivan re: various matters"; "conferred with various in-house personnel" (2 entries); "telephone conference with ... re: developments" (6 entries); "met with Tom Martin and Dave Zerhusen"; "met with D. Zerhusen"; "met with A. Morrison and R. Otto"; "telephone conference with C. Sklarsky"; "office conference with T. Martin."

scriptions the court cannot "determine with a high degree of certainty," [22] as it must, that the billings are reasonable. Therefore, the court must estimate the reduction to be made because of such insufficient documentation.

■ The attorneys also engaged in a plethora of conferences, most often denoted simply as "strategy" conferences, consuming the time of several attorneys who bill at very high rates. The hourly rates charged are of such magnitude as to indicate that the attorneys should have been able to decide on the proper strategy without the great number of strategy conferences attended by numerous firm lawyers. *See Laffey v. Northwest Airline,* 746 F.2d 4, 29–30 (1984) (*partially overruled on other grounds*), *Save Our Cumberland Mountains v. Hodel, supra; Norman v. Housing Authority of the City of Montgomery,* 836 F.2d 1292, 1302 (11th Cir.1988) ("Redundant hours generally occur when more than one attorney represents a client."). We recognize that the case was very important, protracted, unique and was very ably handled, but we find that the number of conferences among the twenty-one attorneys who did some work on the matter were excessive.[23]

> [J]ust as a criminal defendant is entitled to a fair trial and not a perfect one, a litigant is entitled to attorney's fees under 42 U.S.C. § 1988 for an effective and completely [competent] representation *but not one of supererogation.*

*Grendel's Den v. Larkin,* 749 F.2d 945, 953–54 (1st Cir.1984).

The court will combine the *intra-firm conferences that were excessive or redundant with those that are insufficiently documented,* as referred to above, and reduce the fee request by ten percent of all fees incurred at the "A" rate.

■ We are also compelled to specifically exclude several billing entries as "exces-

sive, redundant or unnecessary." [24] Such exclusion include work done preparing grand jury instructions, for which the firm billed $11,127.50. Because United States prosecuting attorneys are thoroughly competent to instruct grand juries and rarely accept or use proffered grand jury instructions from a target of a grand jury investigation, we find these billings unnecessary and therefore unreasonable.

■ We also find that "in-city transportation" in the amount of $880.00 is not sufficiently documented. This ran as high as $190.20 on a single day with 22 trips billed mostly as subway rates. Our reduction is limited to days where the undocumented billings exceeded $30.00.

■ We also do not consider that $3,581.75 in "secretarial overtime," or $280.30 for "overtime dinner expense" are part of a "reasonable attorneys' fee." Prudent planning could have eliminated the need for secretarial overtime.

■ We also disallow the fees billed from November 3 to November 25, 1987, principally by one attorney, in an attempt to defeat the "reauthorization" of the Independent Counsel Act. Congress hardly intended, in authorizing the reimbursement of defense fees for cleared subjects of Independent Counsel proceedings, to pay expenses for lobbying against its legislation—particularly in its later stages when the bill was practically certain of enactment. The billings include lobbying Senate staffers and the Department of Justice. We deduct $2,208.75 billed for these services. We also disallow a minor expense of $155 billed for "press release." *See In re Donovan, supra,* at 993–94.

### III. Conclusion

In sum, in accordance with the above analysis we conclude that the award shall reflect the following:

"C" rates billed for these attorneys varied from $175 to $220 per hour.

---

**22.** United States Tile & Roofing v. G & M Roofing, *supra,* 732 F.2d at 502, n. 2 (6th Cir.1984).

**23.** *See also* n. 21. Four principal lawyers did most of the work on the case. The enhanced

**24.** Hensley v. Eckerhart, 461 U.S. at 433, 103 S.Ct. at 1939.

1. Reduce all attorneys' fees to the "A" rate.

2. Disallow fees for preliminary investigation.

3. Disallow fees for preparing grand jury instructions.

4. Disallow fees for preparing fee application.

5. Disallow fees for librarians, clerical personnel and support staff.

6. Disallow expenses for "secretarial overtime," "overtime dinner expense," some undocumented "in-city transportation" and fee for press release.

7. After all specific deductions are made, the remaining fees will be reduced ten percent to disallow billings for attorneys' services, conferences, and meetings that were excessive, redundant, unnecessary or inadequately documented.

For reasons set forth above, it is Ordered that petitioner be awarded $861,589.28 in reasonable attorneys' fees and expenses. The computation is set forth in the Appendix.

*Judgment accordingly.*

## APPENDIX

| | |
|---|---|
| Fees requested at "C" rates and expenses. Supplemental Petition, 2. | $1,259,072.69 |
| Fees requested at "A" rate and expenses. (affidavit in support of Petition, Tab 1, p. 9) | $1,034,783.75 |
| Supplemental Petition request at "A" rate and expenses. | 19,863.47 |
| Total fee request at "A" rate including expenses. | $1,054,647.22 |

DEDUCTIONS:

| | | |
|---|---|---|
| 1. Preliminary Investigation at "A" rates. | 26,801.25 | |
| 2. Specific deductions in opinion. | | |
| a. Grand Jury Instructions | 11,127.50 | |
| b. Fee Application Preparation | 52,291.25 | |
| c. Lobbying | 2,208.75 | |
| d. Secretarial overtime, overtime dinners, in-city transportation, press release | 4,897.05 | |
| SUBTOTAL OF SPECIFIC DEDUCTIONS | | $ 97,325.80 |
| SUBTOTAL OF REQUEST | | $957,321.42 |
| 3. Ten percent deduction for excessive conferences and insufficient documentation. | | 95,732.14 |
| TOTAL AWARD | | $861,589.28 |