**In re Janet G. MULLINS (Mullins Fee Application).**

**Division No. 92–9.**

United States Court of Appeals, District of Columbia Circuit.

(Division for the Purpose of Appointing Independent Counsels Ethics in Government Act of 1978, as Amended).

May 31, 1996.

---

Before SENTELLE, Presiding Judge,
BUTZNER and FAY, Senior Circuit Judges.

### ORDER

PER CURIAM:

This matter coming to be heard and being heard before the Special Division of the Court, upon the application of Janet G. Mullins for reimbursement of attorneys' fees pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994), and it appearing to the Court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the motion is well taken, it is hereby

ORDERED, ADJUDGED, AND DE-CREED that the United States reimburse Janet G. Mullins for attorneys' fees and expenses she incurred during the investigation by Independent Counsel Joseph E. diGenova in the amount of $223,186.66, this 31st day of May, 1996.

PER CURIAM:

Janet G. Mullins petitions this court under section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994) ("the Act"), for reimbursement of attorneys' fees and expenses that she incurred during and as a result of the investigation conducted by Independent Counsel ("IC") Joseph E. diGenova. Mullins seeks reimbursement in the amount of $348,149.69 for representation from December 1992 through June 1995. After considering Mullins' petition, we find that her request is for the most part reasonable and that she is entitled to attorneys' fees and expenses totaling $223,186.66.

### BACKGROUND

In the fall of 1992, during the presidential campaigns of then-Governor William J. Clinton and then-President George H.W. Bush, a rumor circulated that Clinton, while studying in England during the Vietnam War, had written a letter renouncing his United States citizenship or seeking dual citizenship for the purpose of evading the military draft. *See* Final Report of the Independent Counsel in Re: Janet G. Mullins, Nov. 30, 1995, at 1. In response to the rumor, several news organizations filed requests with the Department of State ("State") and the Department of Justice ("DOJ") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), seeking information about Clinton's citizenship and military draft status during the late 1960's and early 1970's or, more specifically, the alleged renunciation letter. Also, Congressman Gerald Solomon filed a request with State's Legislative Affairs Office seeking information on requests for dual citizenship. *Id.* Around the same time, the existence of the FOIA requests came to the attention of the Bush White House staff, including Janet G. Mullins, who served as Assistant for Political Affairs to Bush and who had previously worked at State. On September 16, 1992, Bush's Chief of Staff, James A. Baker, III, discussed the requests and State's procedure for expediting such requests with Mullins and Margaret Tutwiler, Assistant to the President for Communications. Mullins sub-

sequently told Baker that she would find out what she could about the requests. *Id.* at 2.

In response to the FOIA requests, on September 30, 1992, Elizabeth M. Tamposi, the Assistant Secretary of State for Consular Affairs, directed that a search be made for passport records pertaining to Clinton. State employees conducting the search first reviewed a computerized index of passport applications and then, at Tamposi's request, a team of three senior Consular Affairs officials went to the Washington National Records Center to conduct a manual search of passport records. While the search was in progress, Tamposi tried to contact Tutwiler at the White House but was only able to leave a message for Tutwiler, who was meeting with Mullins at the time. Tutwiler did not return Tamposi's call. *Id.* Tamposi also called Steven K. Berry, Assistant Secretary of State for Legislative Affairs, to determine what he knew about the FOIA requests, and she informed him that a search was underway. Berry then contacted Mullins at the White House and told her about the search, and she, in turn, told Tutwiler, who urged Mullins to notify Baker. *Id.* at 2–3.

The searchers located Clinton's passport file, which was askew in its storage box, but they did not find the rumored renunciation letter. They removed Clinton's file from the records center and took it to Tamposi at her home that evening. She and the searchers thought that Clinton's 1976 passport application had a suspicious tear in the upper left corner that suggested a document attached to the application had been removed. Tamposi contacted Berry that night to tell him that no renunciation letter had been found, and she relayed her suspicions about possible tampering with the file. *Id.* at 3.

The next day, the searchers renewed their search at the records center and then returned to State and prepared a memorandum with Tamposi that detailed the search results, including their concerns about possible tampering with the file. That evening, Tamposi contacted State's Inspector General Sherman Funk, showed him the 1976 application, and turned the tampering issue over to him. Funk then contacted the Federal Bureau of Investigation ("FBI") to handle the

tampering concerns, due to the FBI's forensic capabilities. *Id.* at 3–4.

Baker, aware that the FOIA requests did not meet the requirements for expedited handling and that Clinton's passport records were protected by the Privacy Act, warned Mullins on October 2 not to have anything to do with the records search at State. Mullins replied that while she had discussed the matter with Berry, neither she nor anyone else at the White House bore any responsibility for the search. Mullins subsequently contacted Berry and conveyed Baker's comments and also asked Berry to relay a message to Tamposi from Tutwiler to the effect that while Tutwiler did not want to be rude, she would not be returning Tamposi's call. Berry conveyed the message to Tamposi, but added his own editorial comment that Tutwiler appreciated all Tamposi was doing. *Id.* at 4–5.

Shortly thereafter, *Newsweek* magazine published a story about the search of Clinton's passport files and the possible tampering. When, on October 9, the FBI announced that it found no evidence of tampering, the media then began to focus on why the passport files search had been undertaken in the first place. These inquiries revealed, among other things, that the FOIA requests had been improperly expedited by State, that the search team included political appointees, and that the Operations Center at State had monitored phone calls related to the passport search. Based on these revelations, Funk began an investigation of the passport files search, through which he became aware of the connection between Mullins and Berry. Concerned that the White House may have been involved in the search, Funk directed investigators to interview Mullins, which they did by phone and in person. According to the memorandum of the phone interview prepared by one of the investigators, Mullins stated that her only knowledge about the passport files search was from what she read in the newspapers and that she could not recall whether she told Berry to instruct Tamposi not to call the White House. In the memorandum of the in-person interview with Mul-

■ **463**

lins, however, the investigator reported that Mullins said she and Berry had discussed the search and that she had some knowledge based on these discussions. Based on the apparent discrepancy in the reports of Mullins' interviews and the contact between Mullins and Berry, Funk concluded that Mullins may have made false statements to the investigators, and he referred the case to DOJ for further action. *Id.* at 4–6.

On December 10, DOJ Criminal Division recommended to Attorney General William Barr that he seek appointment of an independent counsel and, on December 11, Barr asked this court to do so. On December 14, one day before the Independent Counsel Act then in effect expired, we appointed Joseph E. diGenova Independent Counsel with authority to investigate and prosecute violations of federal criminal law in connection with the search of Clinton's passport files, including whether Mullins or others made false statements to State investigators or otherwise sought to obstruct Funk's investigation. *Id.* at 6–7. IC diGenova's investigation began in December 1992 and ended in November 1995, with the release of his Final Report. In the Final Report, IC diGenova stated that he found no evidence warranting the criminal prosecution of anyone for their conduct in connection with the passport files search, the disclosure of information from the files, or State's investigation of the search. *Id.* at 377. Regarding Mullins specifically, IC diGenova concluded that, due to discrepancies between the State investigators' contemporaneous interview notes and their later-prepared reports on the interviews with Mullins, there was substantial doubt that Mullins made some of the statements attributed to her by State investigators, that the statements she did make were true or sufficiently ambiguous that proof of their falsity would be impossible, and that even if Mullins made a statement that was arguably false, she made it without any intent to deceive the Inspector General. *Id.* at 390.

Pursuant to the Act, this court, as directed by section 593(f)(2), forwarded a copy of Mullins' fee petition to the Attorney General and the IC and requested that they file written evaluations of the petition. The court expresses its appreciation to the Attorney General and the IC for submitting these evaluations, which we have given due consideration in arriving at the decision announced herein.

## ANALYSIS

■ Mullins is entitled to attorneys' fees under the Act if she satisfies section 593(f)(1), which allows the "subject of an investigation conducted by an independent counsel," "if no indictment is brought against such individual pursuant to that investigation," to request reimbursement for "those reasonable attorneys fees incurred by that individual during that investigation which would not have been incurred but for the requirements of [the Act]." 28 U.S.C. § 593(f)(1). As this court has previously held, a successful petitioner must thus demonstrate that:

(1) he is a "subject" of such investigation;

(2) the fees were incurred "during" the investigation;

(3) the fees would not have been incurred "but for" the requirements of the Act; and

(4) the fees are "reasonable."

*In re North (Cave Fee Application),* 57 F.3d 1117, 1119 (D.C.Cir.1995) (per curiam). We will address each of these requirements in turn.

### A. *"Subject" Status*

■ Mullins states that there is no question that she qualifies as a subject under the Act because IC diGenova specifically notified her that she was a subject of his investigation and she was not indicted. *See In re North (Shultz Fee Application),* 8 F.3d 847, 850 (D.C.Cir.1993) (per curiam) (noting that individual squarely met the subject requirement where IC told him he was a subject). Although DOJ and the IC agree that Mullins plainly qualifies as a subject, they assert that her subject status ended on May 20, 1994, when IC diGenova notified her attorney by letter that he did not intend to seek charges against Mullins and that, based on the information currently available to him, he did not expect Mullins' status to change during the

remainder of the investigation. Mullins argues that this did not end her subject status since IC diGenova's letter contained the express qualification that *based on current information* he did not *expect* her status to change during the remainder of the investigation. *See Cave*, 57 F.3d at 1120 (holding that grant of use immunity did not end Cave's subject status because the IC could have obtained information from other sources if he chose to prosecute Cave); *Shultz*, 8 F.3d at 850 (holding that subject status was not terminated by IC's statement that, in the absence of new developments, he would seek no new indictments). She also maintains that she reasonably believed that the IC's investigation continued to focus on her conduct even after the May 20 letter, especially in light of the IC's October 1994 request for an interview, which Mullins refused, regarding Senator Packwood's diaries. In sum, Mullins asserts that, because the IC never gave her an unqualified assurance that she was no longer a subject and would under no circumstances become one again, she did not know for certain that she would not be indicted until the Final Report was released.

The court has defined the term "subject" for the purposes of the Act's fee reimbursement provision as a person whose conduct is within the scope of the independent counsel's investigation and who knew at the time of incurring the fees that "his conduct was within that scope in such a fashion that 'the [i]ndependent [c]ounsel might reasonably be expected to point the finger of accusation' at him." *Shultz*, 8 F.3d at 850 (quoting *In re North (Dutton Fee Application)*, 11 F.3d 1075, 1078 (D.C.Cir.1993) (per curiam)). In *Shultz*, the court considered three factors when it determined that IC Walsh's September 17, 1992, statement that he would seek no further indictments did not end Shultz's subject status. *Id.* The first factor was that the IC's statement contained the caveat that, in the absence of further developments, there would be no new indictments. The second factor was that IC Walsh actually did obtain indictments after this statement, which demonstrated that the possibility of new developments was not "sufficiently remote to defeat the objective reasonableness of a determination by Shultz and his counsel that there

remained a realistic possibility that the scope of the investigation encompassed his conduct in such a fashion as to make him a potential defendant." *Id.* The third factor, which the court deemed "perhaps the most compelling one," was that Shultz's attorney asked IC Walsh whether Shultz remained a subject and Walsh had, until Shultz filed his fee application, "not retreated from the proposition that Shultz remained a subject." *Id.*

■ In the instant case, Mullins meets only the first factor through IC diGenova's May 20, 1994, statement that he did not intend to seek charges against Mullins and that, based on current information, he did not expect Mullins' status to change during the remainder of his investigation. Unlike the IC in *Shultz*, however, IC diGenova gave Mullins a specific statement about her subject status, rather than a broad statement about the investigation in general, when he said he did not intend to seek charges against her, and, unlike IC Walsh, IC diGenova did not go on to obtain indictments of others after he made that statement to Mullins. *Cf. Cave*, 57 F.3d at 1120 n. 1 (noting that IC never told Cave that he was no longer a subject). In *In re North (Gadd Fee Application)*, 12 F.3d 252, 256 (D.C.Cir.1994) (per curiam), the court determined that although Gadd claimed he remained at risk of criminal prosecution even after receiving a grant of immunity, he did not remain "under such reasonable apprehension of prosecution that he qualified as a 'subject' under the fee award statute thereafter." *See also Dutton*, 11 F.3d at 1079 (noting that although grant of use immunity is not dispositive, it does change the reasonable perception about whether attorneys' fees incurred after the grant were reasonably related to a defense of the independent counsel's investigation). Thus, even though Mullins asserts that she could not be sure that she would not be indicted until the release of the Final Report, we conclude that after IC diGenova notified her that he would not seek charges against her based on current information, she did not remain "under such reasonable apprehension of prosecution," *Gadd*, 12 F.3d at 256, for her activities in connection with the search of Clinton's passport files so as to continue her

subject status for the remainder of IC diGenova's investigation. Accordingly, Mullins' subject status ended on May 20, 1994, and we will not award fees for representation thereafter, except in connection with the Final Report.

### B. Fees Incurred "During" the Investigation

■ Mullins states that she seeks fees for representation from December 14, 1992, to June 27, 1995. The court has identified the maximum time for which fees can be sought as spanning from when an IC begins an investigation of an individual through to the deadline for filing comments to the final report. *See, e.g., In re Olson,* 884 F.2d 1415, 1420–22 (D.C.Cir.1989) (per curiam). The relevant time period in this case is from December 14, 1992, when IC diGenova was appointed, to the August 4, 1995, deadline for filing comments to the Final Report. Although the time sheets submitted by Mullins list charges incurred before December 14, 1992, she properly excluded these fees from her request.

### C. Fees Not Incurred "But For" the Requirements of the Act

■ In *In re Nofziger,* 925 F.2d 428 (D.C.Cir.1991) (per curiam), the court identified three circumstances under which the "but for" requirement of the Act was satisfied:

First, the court has awarded fees in cases in which the subject is prejudiced by the Department of Justice's failure to comply with the substantial protective features of the Act....

Second, fees have been awarded because independent counsel's investigation constituted a substantial duplication of prior investigations....

Third, the court has awarded fees in two cases in which if the requirements of the Act, restricting the Attorney General's preliminary investigation, did not exist, ... the case could have been disposed of at an early stage of the investigation, without seeking appointment of independent counsel.

*Id.* at 438 (citations omitted). Mullins argues that all three circumstances are present in this case. She points out that State's investigation, which was poorly executed, led to the suspicions that she might be guilty of misconduct and, had the Attorney General not been rushed by the sunset provisions of the Act that limited his investigation to ten days rather than the usual ninety, he would have conducted an adequate preliminary investigation and thereby discovered the sloppy reporting of Mullins' interviews by State investigators and the lack of evidence against her. Thus, she maintains that the Act's restrictions hampered the Attorney General's investigation. Further, Mullins asserts, the appointment of the IC led to a substantial and unnecessary duplication of the investigative efforts already undertaken by State, which imposed great personal and financial costs on her. *See In re Olson,* 892 F.2d 1073, 1074 (D.C.Cir.1990) (per curiam) (finding "but for" requirement satisfied because "Perry was being subjected to expenses for a duplicative investigation that he would not have been subjected to in the absence of the Ethics in Government Act.").

DOJ does not take issue with Mullins' assertions, and the IC notes the Final Report concludes that had DOJ had the opportunity to review the State investigators' underlying notes, it would not have sought the appointment of an independent counsel in this matter. The IC, however, raises the possibility that Mullins would have incurred some attorneys' fees even if DOJ conducted a preliminary investigation without then requesting an independent counsel and suggests that an estimate of such hypothetical fees be deducted from Mullins' fee award. We reject this approach because it is too speculative and fails to take into account the fact that Mullins actually incurred attorneys' fees in connection with State's report and referral to DOJ before the IC's appointment that she will not recover under the Act.

Based on the foregoing, we conclude that Mullins would not have incurred the attorneys' fees and expenses for which she seeks reimbursement "but for" the requirements of the Act.

### D. Fees are "Reasonable" under the Act

#### 1. Attorneys' fees

 As we have often observed, the fee petitioner bears the burden of establishing all elements of her entitlement. *See, e.g., Shultz,* 8 F.3d at 850. Mullins must therefore demonstrate that her attorneys charged a reasonable rate and that the time they expended on her representation was reasonable. *See In re North (Gardner Fee Application),* 30 F.3d 143, 146 (D.C.Cir.1994) (per curiam). Based on the affidavits and other exhibits submitted by Mullins, we conclude that the hourly rates charged by her attorneys ($90—$295) comport with prevailing community standards and are within the realm of reasonableness. *Id.* We also conclude that she has, for the most part, provided adequate descriptions and documentation of the work performed. *See National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982) (per curiam) (holding that a fee application must contain sufficiently detailed information about the hours logged and the work done). Mullins submits numerous monthly bills for attorneys' fees and expenses and we will review each bill separately to ensure that all items sought are reimbursable under the Act and are reasonable.

The January 1993 bill totals $22,322.50 and Mullins subtracts $6,800 for representation prior to IC diGenova's appointment on December 14, 1992, and $632.50 for research in connection with recovering attorneys' fees, which is not reimbursable under the Act. *See Gadd,* 12 F.3d at 257 (holding that "fees for fees" are not reimbursable under 28 U.S.C. § 593(f)(1)). We find reasonable the remaining fees of $14,890. The February 1993 bill is for $20,468.75 in attorneys' fees and Mullins subtracts $275 for work on the attorneys' fees issue. We find reasonable the remaining fees of $20,193.75.

 The March 1993 bill totals $53,993.75 in fees, including fees incurred in connection with Mullins' attempt to quash a grand jury subpoena issued to her for records in her possession on the ground that the subpoena arose from the illegal telephone monitoring by State. On August 16, 1993, the district court rejected Mullins' challenge to the subpoena and ordered her to produce the documents, ruling that she lacked standing because she was not a party to any of the monitored phone calls and because the monitoring was not directed at her. Final Report at 33. Mullins filed a series of stay motions and an appeal and refused to turn over the documents until she was threatened with incarceration for contempt. After the denial of her emergency motion for a stay of the contempt order, Mullins produced the responsive documents on September 17, 1993. *Id.* at 34–36. The IC argues that once the district court ruled that Mullins lacked standing to contest the subpoena, the litigation strategy Mullins followed thereafter was frivolous and should not be reimbursed under the Act. Mullins responds that the Act does not authorize the IC or the court to revisit the merits of legal choices made by counsel during a subject's representation, and she emphasizes that, as the focus of the investigation, she had to mount the most aggressive defense possible. She therefore maintains that the IC has no basis upon which to claim that her continued challenge to the subpoena was frivolous.

As we have previously observed, fees that may not be "unreasonable between a first class law firm and a solvent client, are not [always] supported by indicia of reasonableness sufficient to allow us justly to tax the same against the United States." *Shultz,* 8 F.3d at 852; *see also In re Donovan,* 877 F.2d 982, 996 (D.C.Cir.1989) (per curiam) (noting that without passing judgment on the propriety of professional judgments, counsel is not free to exercise judgment in a way that unnecessarily inflates the other party's fee liability). Thus, while "we do not 'pass judgment on the propriety' of professional decisions of counsel or the wisdom of their client's decision in its contract, ... we are duty bound to recall that Congress required us to exercise our independent judgment on the reasonableness of fees requested before taxing them against the United States." *In re North (Bush Fee Application),* 59 F.3d 184, 189 (D.C.Cir.1995) (per curiam) (quoting *Donovan,* 877 F.2d at 996).

Although we would not characterize as frivolous Mullins' continuing challenge to the subpoena after the district court ruled against her, we conclude that it lacks "indicia of reasonableness" sufficient to justify billing this cost to the public fisc. *Shultz*, 8 F.3d at 852. Accordingly, we will deduct fees incurred in continuing to challenge the subpoena after August 16, 1993. While this deduction does not affect the March 1993 bill, there are other deductions for reasonableness that we must make from the March bill. First, although it is difficult to tell precisely since fees are listed on a per day rather than a per task basis, it appears that for preparation of the motion to quash the subpoena partner Thomas Wilson billed a total of 94.75 hours at $275 per hour and associate James Edmundson billed 125.5 hours at $125 per hour. We find that Mullins has failed to demonstrate the reasonableness of spending a total of 220.25 hours ($41,743.75) on the preparation of this one motion and we will reduce by one-half the fees awarded for the preparation of this motion. *See American Petroleum Inst. v. EPA*, 72 F.3d 907, 915–16 (D.C.Cir.1996) (reducing fees for failure to demonstrate reasonableness of time spent on motions). We will also deduct the fees billed by Edmundson for attending two joint defense meetings that Wilson also attended, which we estimate as totaling $600 (4 hours at $125 per hour). *See Bush*, 59 F.3d at 190 (deducting fees for duplication of effort). Based on the foregoing, we award $32,521.87 in attorneys' fees claimed on the March 1993 bill.

The April 1993 bill is for $5,856.25, from which Mullins subtracts $31.25 for fees in connection with a trust agreement. We find the remaining $5,825 reasonable. The May 1993 bill is for $28,507.50 but it includes the same fees listed in the April bill, so first we will subtract $5,856.25, which leaves $22,651.25 for May. Three attorneys bill 2.5 hours each for attending a meeting together and, to avoid reimbursement for duplication of effort, we will deduct the fees incurred by the two lowest-billing attorneys, which total $725. *See id.* Starting in the May bill and continuing into the June one, Mullins' attorneys expended in excess of 130 hours preparing a reply to the IC's opposition to the motion to quash. As we noted in connection with the preparation of the motion to quash, Mullins has failed to demonstrate the reasonableness of spending this much time on the preparation of the reply, especially given the large amount of time already expended on the initial motion, and we will reduce by one-half the fees awarded for the preparation of the reply. *See American Petroleum Inst.*, 72 F.3d at 915–16. Because the billing is not done on a per task basis our calculations will necessarily be rough, and we estimate that in the May 1993 bill Wilson spent 22.5 hours at $275 per hour on the reply, Edmundson spent 36.25 hours at $125 per hour, and Mary Beth Sullivan spent 13.75 hours at $165 per hour, for a total of $12,987.50 billed for the reply in May. Accordingly, we will deduct $6,493.75 from the May charges and award $15,432.50 in fees for that month.

The June 1993 bill is for $15,473.75 and it lists 25.75 hours for Wilson, 33 hours for Edmundson, and 4.75 hours for Sullivan expended in preparation of the reply. These hours amount to $11,990 in fees, and we will deduct half this amount from the total June bill, thus awarding $9,478.75 for this month.

The July 1993 bill is for $4,237.50 and Mullins deducts $93.75 in nonreimbursable fees for document deliveries by professionals. *See Bush*, 59 F.3d at 194 (deducting professional time billed for delivery of documents). We find the remaining $4,143.75 reasonable.

The August 1993 bill is for $18,616.25 but it includes the $4,237.50 already billed in July 1993, thus leaving $14,378.75 properly attributable to August. It also includes billing for Mullins' motion to intervene in and quash IC diGenova's June 30, 1993, subpoena to C & P Telephone Company for the toll records of Mullins' home telephone. Although the district court allowed Mullins to intervene, it denied the motion to quash on the basis that she was not an aggrieved person and lacked standing. The IC argues that Mullins' should not be reimbursed for work on the motion to quash the C & P subpoena since her position was frivolous in light of the Supreme Court's repeated affirmation of "the general rule that the issuance of a subpoena to a third party to obtain the

records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued." *United States v. Miller,* 425 U.S. 435, 444, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976). The IC further observes that courts have consistently found telephone toll records to fall within the scope of *Miller.* *See, e.g., United States v. Baxter,* 492 F.2d 150, 167 (9th Cir.1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *United States v. Covello,* 410 F.2d 536, 542 (2d Cir.), *cert. denied,* 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969). Mullins replies that the motion was not frivolous since *Miller* and the other cases cited by the IC do not specifically address the anti-wiretap statute, upon which she based her challenge.

In *Reporters Committee for Freedom of the Press v. American Telephone and Telegraph Company,* 593 F.2d 1030, 1045, 1044–46 (D.C.Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979), the court held that *Miller* applies to toll records maintained by telephone companies, noting that a "telephone subscriber is fully aware when he places a long distance call that the telephone company will make a record of the call, that the record is the company's property, and that the Government has ready access to the record for law enforcement purposes." Mullins does not adequately explain how she could distinguish this clear Circuit precedent, and we therefore find that she has failed to demonstrate the reasonableness of the time expended in preparing the motion to quash the C & P subpoena and will not reimburse the fees incurred in connection with this filing. Specifically, in the August 1993 bill Wilson billed 8.75 hours at $275 per hour and Edmundson billed 29.5 hours at $125 per hour in connection with the motion to quash the C & P subpoena. Accordingly, we deduct $6,093.75 from the remainder of the August 1993 bill and award $8,285 in reasonable fees for this month.

The September 1993 bill totals $56,537.50, but includes previously billed time entries up to July 28, 1993, which already appeared in the August bill, and we will therefore subtract $14,378.75 for these items. On July 28, Edmundson billed 5.25 hours for several tasks, one of which was finalizing the reply brief in support of the motion to quash the C & P subpoena. We estimate that this task took 3 hours and will subtract $375. The district court denied Mullins' motions to quash on August 16, 1993, and, as we concluded above, Mullins has not demonstrated the reasonableness of the fees expended appealing and otherwise resisting the district court's ruling denying her challenges to the subpoenas. We will therefore deduct the 66.25 hours at $275 per hour billed by Wilson, the 72.5 hours at $125 per hour billed by Edmundson, and the 4.75 hours at $90 per hour billed by William Birchfield on these matters, for a total of $27,708.75. Accordingly, we award $14,075 for the September 1993 bill.

The October 1993 bill totals $48,643.75. Continuing the deductions for time expended challenging the district court's ruling on the subpoenas, we subtract the fees for 73.75 hours at $275 per hour for Wilson and 92.5 hours at $125 per hour for Edmundson, for a total of $31,843.75. Mullins correctly takes out $125 for time spent replying to media inquiries. *See In re Meese,* 907 F.2d 1192, 1203 (D.C.Cir.1990) (per curiam) (deducting fees for media-related activity as not reasonably related to defense of an independent counsel investigation). This leaves $16,675 in reimbursable fees for the October 1993 bill.

We find reasonable the November bill for $3,525 and the December 1993 bill for $2,737.50. The January 1994 bill totals $6,112.50 and Mullins deducts $137.50 for time spent in connection with fee reimbursement research. We find the remaining $5,975 reasonable.

The February 1994 bill is for $10,677.50, but it includes the $6,112.50 billed in January. The remaining $4,565 is reasonable. The March 1994 bill totals $5,232.50, all of which is reasonable.

The April 1994 bill is for $22,572.50 and includes fees for a March 14 meeting with IC diGenova and telephone conference call with Mullins in which both Wilson and Edmundson participated. We estimate that these two activities took three hours and deduct Edmundson's hours billed at $140 per hour ($420) for duplication of effort. *See Bush,* 59

F.3d at 190. We find reasonable the remaining $22,152.50.

■ The May 1994 bill totals $18,597.50 and includes fees for both Wilson and Edmundson to attend Mullins' interview by IC diGenova on April 5, 1994. While we have been deducting fees for duplication of effort, we acknowledge the reasonableness of two attorneys attending such a critical interview and therefore allow the fees of both attorneys for this meeting. On April 19, however, both attorneys participated in a telephone conference call with the attorney for another subject regarding Mullins' interview and we deduct the fee for the lower-billing attorney (1 hour at $140) for duplication of effort. We therefore allow $18,457.50 in fees for this month.

■ The June 1994 bill is for $3,797.50 and includes billing for services rendered after May 20, 1994, the date on which IC diGenova notified Mullins that she was no longer a subject. The fees incurred up to and including May 20 are reasonable, and we will allow fees incurred on May 23 for the necessary winding-up activities of organizing the files and discussing the effect of the May 20 letter. In sum, we allow $3,383.75 for this month.

Because Mullins no longer qualified as a subject after May 20, 1994, she cannot recover her fees for the remaining months of IC diGenova's investigation. She can, however, recover fees incurred in reading and deciding whether to respond to IC diGenova's Final Report. See Donovan, 877 F.2d at 994 (permitting fees for preparation of response to final report since Act permits subjects to file comments and factual information for inclusion in appendix to report). Starting May 8, 1994, Mullins incurred $8,745.62 in connection with the Final Report, all of which we find reasonable.

In sum, we award $216,294.99 to Mullins in attorneys' fees that she incurred during the investigation conducted by IC diGenova.

### 2. Expenses

Mullins seeks $8,869.07 in expenses incurred in connection with her representation during the investigation, which she states consist chiefly of charges for photocopying, computerized legal research, word processing services, telexes, delivery services, telephone charges, and cab fare. We will examine these expenses on a month-by-month basis to determine whether they are reasonable and reimbursable under the Act.

■ Mullins seeks expenses of $583.50 incurred in January 1993 for delivery services, photocopying, and fax charges, all of which we find reasonable. For February 1993, she seeks $1,222.40 for delivery, fax, and photocopying charges, which we will allow. Reimbursable expenses incurred primarily in March 1993 total $701.94. Starting with the April 1993 expenses, Mullins seeks reimbursement for word processing charges. Because she has provided no further justification for these charges beyond their bare description, it appears that they fall within the bounds of attorneys' overhead, much like secretarial overtime, which is not reimbursable under the Act. Bush, 59 F.3d at 195. As we have previously observed, "the most commonly offered justification for hourly rates that strike most non-lawyers as exorbitant is that they include not only the attorney's time but the payment of his overhead." Id. Such overhead costs are not separately reimbursable over and above rates that already approach $300 per hour. Accordingly, we will deduct these word processing charges and allow $244.60 for April 1993 for photocopying, fax, and delivery expenses.

Reimbursable May 1993 charges for photocopying, fax, and delivery services total $252.35; June charges for the same services total $68.40. Disallowing word processing and unexplained taxi charges, see id., leaves $639.61 in reimbursable expenses for July and $173.57 for August. The September 1993 bill lists numerous expenses incurred in connection with the appeal of the district court's denial of Mullins' motion to quash the subpoenas. For the reasons indicated above, these expenses, like the related attorneys' fees, are not reimbursable. The bill also lists $1,577.50 in copying charges, which are not otherwise identified, and we will deduct one-half of these charges to avoid reimbursement for appeal-related copying expenses. After deducting charges for word processing and

unexplained taxi service, we conclude that there are $1,396.11 in reimbursable expenses for September.

For October 1993, after deducting appeal-related expenses and all taxi charges except for one round trip connected with a filing, we allow $344 for delivery, fax, copying, and transcript expenses. The November charges total $430.35, and the December charges total $338.19, all of which is reimbursable.

The January 1994 charge of $60.25 for copying, and the February charges of $83.10 for computerized research, faxing, and copying, and the March charges of $158.75 for delivery, fax and copy services are all reasonable. As for April, we allow the $7 charge for delivery service, while deducting charges for word processing and unexplained taxi fare. Finally, we allow expenses up to May 23, the last day for which we allow fees arising from Mullins' subject status. These expenses total $187.55 for copying, fax, delivery, and phone services.

Mullins requests no expenses in connection with the Final Report. Accordingly, we award $6,891.67 in total expenses.

## CONCLUSION

Based on the foregoing analysis, we will grant Mullins' petition in part and award $216,294.99 for attorneys' fees and $6,891.67 for expenses, making a total award of $223,186.66.

*Judgment accordingly.*