**In re Janet G. MULLINS (Tutwiler Fee Application).**

**Division No. 92–9.**

United States Court of Appeals,
District of Columbia Circuit.

July 9, 1996.

Division for the Purpose of Appointing Independent Counsels Ethics in Government Act of 1978, as Amended.

Before: SENTELLE, Presiding Judge,
BUTZNER and FAY, Senior Circuit Judges.

## ORDER

PER CURIAM.

This matter coming to be heard and being heard before the Special Division of the Court, upon the application of Margaret DeB. Tutwiler for reimbursement of attorneys' fees pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994), and it appearing to the Court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the motion is well taken, it is hereby

ORDERED, ADJUDGED, AND DECREED that the United States reimburse Margaret DeB. Tutwiler for attorneys' fees and expenses she incurred during the investigation by Independent Counsel Joseph E. diGenova in the amount of $136,219.23 this 9th day of July, 1996.

> *Per Curiam*
>
> For the Court:
>
> Mark J. Langer, Clerk
>
> by
>
> Marilyn Sargent
>
> Chief Deputy Clerk

Opinion for the Special Court filed PER CURIAM.

PER CURIAM:

Margaret DeB. Tutwiler petitions this court under section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994) ("the Act"), for reimbursement of attorneys' fees and expenses that she incurred during and as a result of the investigation conducted by Independent Counsel ("IC") Joseph E. diGenova. Tutwiler seeks reimbursement in the amount of $140,023.51 for representation from December 1992 through November 1995. After considering Tutwiler's petition, we find that her request is for the most part reasonable and that she is entitled to attorneys' fees and expenses totaling $136,219.23.

## BACKGROUND

In the fall of 1992, during the presidential campaigns of then-Governor William J. Clinton and then-President George H.W. Bush, a rumor circulated that Clinton, while studying in England during the Vietnam War, had written a letter renouncing his United States citizenship or seeking dual citizenship for the purpose of evading the military draft. *See* Final Report of the Independent Counsel In Re: Janet G. Mullins, Nov. 30, 1995, at 1. In response to the rumor, several news organizations filed requests with the Department of State ("State") and the Department of Justice ("DOJ") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), seeking information about Clinton's citizenship and military draft status during the late 1960's and early 1970's or, more specifically, the alleged renunciation letter. Also, Congressman Gerald Solomon filed a request with State's Office of Legislative Affairs seeking information on requests for dual citizenship. *Id.* Around the same time, the existence of the FOIA requests came to the attention of the Bush White House staff, including Janet G. Mullins, who served as Assistant for Political Affairs to Bush and who had previously worked at State. On September 16, 1992, Bush's Chief of Staff, James A. Baker, III, discussed the requests and State's procedure for expediting such requests with Mullins and Margaret Tutwiler, Assistant to the President for Communications. *Id.* at 2.

In response to the FOIA requests, on September 30, 1992, Elizabeth M. Tamposi, the Assistant Secretary of State for Consular Affairs, directed that a search be made for passport records pertaining to Clinton. State employees conducting the search first reviewed a computerized index of passport applications and then, at Tamposi's request, a team of three senior Consular Affairs officials went to the Washington National Records Center to conduct a manual search of passport records. While the search was in progress, Tamposi tried to contact Tutwiler at the White House but was only able to leave a message for Tutwiler, who was meeting with Mullins at the time. Tutwiler did not return Tamposi's call. *Id.* Tamposi also called Steven K. Berry, Assistant Secretary of State for Legislative Affairs, to determine what he knew about the FOIA requests, and she informed him that a search was underway. Berry then contacted Mullins at the White House and told her about the search, and she, in turn, told Tutwiler, who urged Mullins to notify Baker. *Id.* at 2–3.

The searchers located Clinton's passport file, which was askew in its storage box, but they did not find the rumored renunciation letter. They removed Clinton's file from the records center and took it to Tamposi at her

home that evening. She and the searchers thought that Clinton's 1976 passport application had a suspicious tear in the upper left corner that suggested a document attached to the application had been removed. Tamposi contacted Berry that night to tell him that no renunciation letter had been found, and she relayed her suspicions about possible tampering with the file. *Id.* at 3.

The next day, the searchers renewed their search at the records center and then returned to State and prepared a memorandum with Tamposi that detailed the search results, including their concerns about possible tampering with the file. That evening, Tamposi contacted State's Inspector General Sherman Funk, showed him the 1976 application, and turned the tampering issue over to him. Funk then contacted the Federal Bureau of Investigation ("FBI") to handle the tampering concerns, due the FBI's forensic capabilities. *Id.* at 3–4.

On October 2, Baker warned Mullins not to have anything to do with the records search at State, and Mullins replied that while she had discussed the matter with Berry, neither she nor anyone else at the White House bore any responsibility for the search. Mullins subsequently contacted Berry to convey Baker's comments and also asked Berry to relay a message to Tamposi from Tutwiler to the effect that while Tutwiler did not want to be rude, she would not be returning Tamposi's call. Berry conveyed the message to Tamposi, but added his own editorial comment that Tutwiler appreciated all Tamposi was doing. *Id.* at 4–5.

Shortly thereafter, *Newsweek* magazine published a story about the search of Clinton's passport files and the possible tampering. When, on October 9, the FBI announced that it found no evidence of tampering, the media then began to focus on why the passport files search had been undertaken in the first place. These inquiries revealed, among other things, that the FOIA requests had been improperly expedited by State, that the search team included political appointees, and that the Operations Center at State had monitored phone calls related to the passport search. Based on these revelations, Funk began

an investigation of the passport files search, through which he became aware of the connection between Mullins and Berry. Based on the apparent discrepancy in the investigators' reports of Mullins' interviews and the contact between Mullins and Berry, Funk concluded that Mullins may have made false statements to the investigators and referred the case to DOJ for further action. *Id.* at 4–6.

On December 10, DOJ Criminal Division recommended to Attorney General William Barr that he seek appointment of an independent counsel and, on December 11, Barr asked this court to do so. On December 14, one day before the Independent Counsel Act then in effect expired, we appointed Joseph E. diGenova Independent Counsel with authority to investigate and prosecute violations of federal criminal law in connection with the search of Clinton's passport file. *Id.* at 6–7. IC diGenova's investigation began in December 1992 and ended in November 1995, with the release of his Final Report. In the Final Report, IC diGenova stated that he found no evidence warranting the criminal prosecution of anyone for their conduct in connection with the passport files search, the disclosure of information from the files, or State's investigation of the search. *Id.* at 377. Regarding Tutwiler specifically, he concluded that she was not involved in either the passport files search or the events surrounding it and that there was no evidence that she did anything improper. *Id.* at 383–84.

Pursuant to the Act, this court, as directed by section 593(f)(2), forwarded a copy of Tutwiler's fee petition to the Attorney General and the IC and requested that they file written evaluations of the petition. The court expresses its appreciation to the Attorney General and the IC for submitting these evaluations, which we have given due consideration in arriving at the decision announced herein.

## ANALYSIS

Tutwiler is entitled to attorneys' fees under the Act if she satisfies section 593(f)(1), which allows the "subject of an investigation conducted by an independent

counsel," "if no indictment is brought against such individual pursuant to that investigation," to request reimbursement for "those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of [the Act]." 28 U.S.C. § 593(f)(1). As this court has previously held, a successful petitioner must thus demonstrate that:

(1) he is a "subject" of such investigation;

(2) the fees were incurred "during" the investigation;

(3) the fees would not have been incurred "but for" the requirements of the Act; and

(4) the fees are "reasonable."

*In re North (Cave Fee Application)*, 57 F.3d 1117, 1119 (D.C.Cir.1995) (per curiam). We will address each of these requirements in turn.

### A. "Subject" Status

■ Tutwiler, who was not indicted, argues that based on IC diGenova's investigation of her conduct and statement that she was a subject, she clearly meets the Act's subject requirement. Neither the IC nor DOJ dispute her subject status. Because IC diGenova clearly focused on Tutwiler's possible criminal culpability in connection with the passport files search and the events surrounding it, we conclude Tutwiler's conduct was within the scope of the IC's investigation and that she knew her "conduct was within that scope in such a fashion that 'the independent counsel might reasonably be expected to point the finger of accusation' at [her]." *In re North (Shultz Fee Application)*, 8 F.3d 847, 850 (D.C.Cir.1993) (per curiam) (quoting *In re North (Dutton Fee Application)*, 11 F.3d 1075, 1078 (D.C.Cir.1993) (per curiam)). Accordingly, she qualifies as a subject under the Act. We also conclude that her subject status ended on January 26, 1995, when IC diGenova notified her that he did not intend to seek charges against her. We will, however, allow the fees in connection with verifying the end of her subject status incurred on January 27, 1995.

### B. Fees Incurred "During" the Investigation

■ Tutwiler seeks fees for representation from December 15, 1992, to November 1995. The court has identified the maximum time for which fees can be sought as spanning from when an IC begins an investigation of an individual through to the deadline for filing comments to the final report. *See, e.g., In re Olson*, 884 F.2d 1415, 1420–22 (D.C.Cir.1989) (per curiam). The relevant time period in this case is from December 14, 1992, when IC diGenova was appointed, to the end of Tutwiler's subject status on January 26, 1995, and from the May 5, 1995, notice that the Final Report was available to the August 4, 1995, deadline for filing comments to the Report. Accordingly, we cannot allow the fees incurred after January 27 and before May 5, 1995, and those incurred after August 4, 1995, because they do not qualify as being incurred either during Tutwiler's subject status in the investigation or during the comment period for the Final Report.

### C. Fees Not Incurred "But For" the Requirements of the Act

■ In *In re Nofziger*, 925 F.2d 428 (D.C.Cir.1991) (per curiam), the court identified three circumstances under which the "but for" requirement of the Act was satisfied:

First, the court has awarded fees in cases in which the subject is prejudiced by the Department of Justice's failure to comply with the substantial protective features of the Act....

Second, fees have been awarded because independent counsel's investigation constituted a substantial duplication of prior investigations....

Third, the court has awarded fees in two cases in which if the requirements of the Act, restricting the Attorney General's preliminary investigation, did not exist, ... the case could have been disposed of at an early stage of the investigation, without seeking appointment of independent counsel.

*Id.* at 438 (citations omitted). The IC and DOJ do not dispute that the fees would not

have been incurred "but for" the requirements of the Act. As we concluded in *In re Mullins (Mullins Fee Application)*, 84 F.3d 459, 465 (D.C.Cir.1996), the circumstances surrounding the referral to DOJ by State and the Attorney General's limited investigative period satisfy the "but for" requirement of the Act.

*D. Fees are "Reasonable" under the Act*

 As we have often observed, the fee petitioner bears the burden of establishing all elements of her entitlement. *See, e.g., Shultz*, 8 F.3d at 850. Tutwiler must therefore demonstrate that her attorneys charged a reasonable rate and that the time they expended on her representation was reasonable. *See In re North (Gardner Fee Application)*, 30 F.3d 143, 146 (D.C.Cir.1994) (per curiam). Based on the affidavits and other exhibits submitted by Tutwiler, we conclude that the hourly rates charged by her attorneys ($115–$375) and their paralegals ($70–$110) comport with prevailing community standards and are within the realm of reasonableness. *Id.* We also conclude that she has, for the most part, provided adequate descriptions and documentation of the work performed. *See National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1327 (D.C.Cir.1982) (per curiam) (holding that a fee application must contain sufficiently detailed information about the hours logged and the work done).

 The IC questions the reasonableness of Tutwiler's fees incurred in connection with her motion to quash her subpoenas as the fruit of illegal monitoring because, in rejecting these challenges, the district court concluded that Tutwiler was not an aggrieved person and lacked standing because none of her phone calls had been illegally monitored by State during the relevant time period. Tutwiler responds that her motion to quash had a strong legal and factual basis and that, moreover, there was no way for her to know whether she had been illegally monitored, and would therefore have standing, before she filed the motion. *See In re Evans*, 452 F.2d 1239, 1247 (D.C.Cir.1971), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972) (noting that under 18 U.S.C. § 3504(a), the assertion of illegal monitoring by the subpoenaed party requires the government to respond and either confirm or deny the monitoring). We agree with Tutwiler that the fees arising from her challenge to the subpoena issued to her were reasonable since she could not know whether she had standing until the government admitted or denied such monitoring of Tutwiler. We further conclude, however, that her appeal of the district court's ruling lacks "indicia of reasonableness," *Shultz*, 8 F.3d at 852, sufficient to justify billing this cost to the public fisc. *See Mullins*, 84 F.3d at 466. Accordingly, we deduct $1,715 in fees incurred in connection with the appeal.

 Tutwiler also challenged the subpoena issued to her phone company for her billing records. In *United States v. Miller*, 425 U.S. 435, 444, 96 S.Ct. 1619, 1624–25, 48 L.Ed.2d 71 (1976), the Court cited "the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued." Furthermore, in *Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Company*, 593 F.2d 1030, 1045, 1044–46 (D.C.Cir.1978), *cert. denied*, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979), the court held that *Miller* applies to toll records maintained by telephone companies, noting that a "telephone subscriber is fully aware when he places a long distance call that the telephone company will make a record of the call, that the record is the company's property, and that the Government has ready access to the record for law enforcement purposes." Tutwiler does not adequately explain how she could distinguish this clear precedent, and we therefore find that she has failed to demonstrate the reasonableness of the time expended in preparing the motion to quash the subpoena to the telephone company and will deduct the $736.25 in fees incurred in connection with this filing. *See Mullins*, 84 F.3d at 467.

 Finally, we note that two attorneys attended a joint defense meeting with another subject's counsel, and we will deduct the

$160 billed by one of them to avoid reimbursement for duplication of effort. *See In re North (Bush Fee Application),* 59 F.3d 184, 190 (D.C.Cir.1995) (per curiam) (deducting fees for duplication of effort). Also, Tutwiler's attorneys billed $336.25 in fees for editing another subject's filing and discussing that subject's civil suit. We deduct these fees since they are not properly attributable to the representation of Tutwiler in defense of the IC's investigation.

In sum, we make the following deductions from the total attorneys' fees requested by Tutwiler:

| | | |
|---|---|---|
| Attorneys' fees requested | | $131,647.12 |
| Deduction for fees between 1/28/95 & 5/5/95 | $281.25 | |
| Deduction for phone subpoena fees | $736.25 | |
| Deduction for appeal | $1,715 | |
| Deduction for duplication of effort | $160 | |
| Deduction for fees attributable to other party | $336.25 | |
| Deduction for final report fees after 8/4/95 | $375 | |
| Total deductions | | $3,603.75 |
| Attorneys' fees awarded | | $128,043.37 |

■ Tutwiler also seeks $8,376.39 in expenses for phone calls, postage, duplicating, facsimiles, cab fare, and computerized research incurred in connection with her representation during the investigation. While we find most of these charges reasonable, we must make a few deductions. First, Tutwiler seeks $175.75 for travel and cab fare expenses that are identified as incurred in a given month, rather than connected to a specific event or task. We will reduce this by one-half to account for the lack of specificity and thus deduct $87.88. Second, for the same reasons that we disallowed attorneys' fees for the appeal of the district court's denial of the motion to quash, we disallow the $105 filing fee claimed. Third, we disallow $7.65 in expenses incurred after the August 4, 1995, deadline for comments to the Final Report. In sum, we will allow the remaining $8,175.86 in expenses.

## CONCLUSION

Based on the foregoing analysis, we will grant Tutwiler's petition and award $128,043.37 for attorneys' fees and $8,175.86 for expenses, making a total award of $136,219.23.

*Judgment accordingly.*