**In re Janet G. MULLINS (Berry Fee Application).**

**Division No. 92–9.**

United States Court of Appeals, District of Columbia Circuit.

Division for the Purpose of Appointing Independent Counsels Ethics in Government Act of 1978, as Amended.

Aug. 20, 1996.

Before: SENTELLE, Presiding Judge, BUTZNER and FAY, Senior Circuit Judges.

## ORDER

PER CURIAM.

This matter coming to be heard and being heard before the Special Division of the Court, upon the application of Steven K. Berry for reimbursement of attorneys' fees pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994), and it appearing to the Court for the reasons set forth more fully in the opinion filed contemporaneously herewith, that the motion is well taken, it is hereby

**ORDERED, ADJUDGED, AND DE-CREED** that the United States reimburse Steven K. Berry for attorneys' fees and expenses he incurred during the investigation by Independent Counsel Joseph E. diGenova in the amount of$216,377.54 this 20th day of August, 1996.

Opinion for the Special Court filed PER CURIAM.

PER CURIAM:

Steven K. Berry petitions this court under section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. §§ 591–599 (1994) ("the Act"), for reimbursement of attorneys' fees and expenses that he incurred during and as a result of the investigation conducted by Independent Counsel ("IC")

Joseph E. diGenova. Berry seeks reimbursement in the amount of $262,215.14 for representation from December 1992 through August 1995. After considering Berry's petition, we find that his request is for the most part reasonable and that he is entitled to attorneys' fees and expenses totaling $216,-377.54.

## BACKGROUND

In the fall of 1992, during the presidential campaigns of then-Governor William J. Clinton and then-President George H.W. Bush, a rumor circulated that Clinton, while studying in England during the Vietnam War, had written a letter renouncing his United States citizenship or seeking dual citizenship for the purpose of evading the military draft. *See* Final Report of the Independent Counsel in Re: Janet G. Mullins, Nov. 30, 1995, at 1. In response to the rumor, several news organizations filed requests with the Department of State ("State") and the Department of Justice ("DOJ") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), seeking information about Clinton's citizenship and military draft status during the late 1960s and early 1970s or, more specifically, the alleged renunciation letter. Also, Congressman Gerald Solomon filed a request with State's Office of Legislative Affairs seeking information on requests for dual citizenship. *Id.* Around the same time, the existence of the FOIA requests came to the attention of the Bush White House staff, including Janet G. Mullins, who served as Assistant for Political Affairs to Bush and who had previously worked at State. On September 16, 1992, Bush's Chief of Staff, James A. Baker, III, discussed the requests and State's procedure for expediting such requests with Mullins and Margaret Tutwiler, Assistant to the President for Communications. *Id.* at 2.

In response to the FOIA requests, on September 30, 1992, Elizabeth M. Tamposi, the Assistant Secretary of State for Consular Affairs, directed that a search be made for passport records pertaining to Clinton. State employees conducting the search first reviewed a computerized index of passport applications and then, at Tamposi's request, a team of three senior Consular Affairs offi-

cials went to the Washington National Records Center to conduct a manual search of passport records. While the search was in progress, Tamposi tried to contact Tutwiler at the White House but was only able to leave a message for Tutwiler, who was meeting with Mullins at the time. Tutwiler did not return Tamposi's call. *Id.* Tamposi also called Berry, Assistant Secretary of State for Legislative Affairs, to determine what he knew about the FOIA requests, and she informed him that a search was underway. Berry then contacted Mullins at the White House and told her about the search, and she, in turn, told Tutwiler, who urged Mullins to notify Baker. *Id.* at 2–3.

The searchers located Clinton's passport file, which was askew in its storage box, but they did not find the rumored renunciation letter. They removed Clinton's file from the records center and took it to Tamposi at her home that evening. She and the searchers thought that Clinton's 1976 passport application had a suspicious tear in the upper left corner that suggested a document attached to the application had been removed. Tamposi contacted Berry that night to tell him that no renunciation letter had been found, and she relayed her suspicions about possible tampering with the file. *Id.* at 3.

The next day, the searchers renewed their search at the records center and then returned to State and prepared a memorandum with Tamposi that detailed the search results, including their concerns about possible tampering with the file. That evening, Tamposi contacted State's Inspector General Sherman Funk, showed him the 1976 application, and turned the tampering issue over to him. Funk then contacted the Federal Bureau of Investigation ("FBI") to handle the tampering concerns, due the FBI's forensic capabilities. *Id.* at 3–4.

On October 2, Baker warned Mullins not to have anything to do with the records search at State, and Mullins replied that while she had discussed the matter with Berry, neither she nor anyone else at the White House bore any responsibility for the search. Mullins subsequently contacted Berry to convey Baker's comments and also asked Berry to relay a message to Tamposi from Tutwiler to the

effect that, while Tutwiler did not want to be rude, she would not be returning Tamposi's call. Berry conveyed the message to Tamposi, but added his own editorial comment that Tutwiler appreciated all Tamposi was doing. *Id.* at 4–5.

Shortly thereafter, *Newsweek* magazine published a story about the search of Clinton's passport file and the possible tampering. When, on October 9, the FBI announced that it found no evidence of tampering, the media then began to focus on why the passport files search had been undertaken in the first place. These inquiries revealed, among other things, that the FOIA requests had been improperly expedited by State, that the search team included political appointees, and that the Operations Center at State had monitored phone calls related to the passport search. Based on these revelations, Funk began an investigation of the passport files search, through which he became aware of the connection between Mullins and Berry. Based on the apparent discrepancy in the investigators' reports of Mullins' interviews and the contact between Mullins and Berry, Funk concluded that Mullins may have made false statements to the investigators and referred the case to DOJ for further action. *Id.* at 4–6.

On December 10, DOJ Criminal Division recommended to Attorney General William Barr that he seek appointment of an independent counsel and, on December 11, Barr asked this court to make such an appointment. On December 14, one day before the Independent Counsel Act then in effect expired, we appointed Joseph E. diGenova Independent Counsel with authority to investigate and prosecute violations of federal criminal law in connection with the search of Clinton's passport file. *Id.* at 6–7. IC diGenova's investigation began in December 1992 and ended in November 1995, with the release of his Final Report. In the Final Report, IC diGenova stated that he found no evidence warranting the criminal prosecution of anyone for their conduct in connection with the passport files search, the disclosure of information from the files, or State's investigation of the search. *Id.* at 377. Re-

garding Berry specifically, he concluded that Berry neither led nor joined a conspiracy to violate the Privacy Act and the Hatch Act. *Id.* at 419–27.

Pursuant to the Act, this court, as directed by section 593(f)(2), forwarded a copy of Berry's fee petition to the Attorney General and the IC and requested that they file written evaluations of the petition. The court expresses its appreciation to the Attorney General and the IC for submitting these evaluations, which we have given due consideration in arriving at the decision announced herein.

## ANALYSIS

■ Berry is entitled to attorneys' fees under the Act if he satisfies section 593(f)(1), which allows the "subject of an investigation conducted by an independent counsel ... if no indictment is brought against such individual pursuant to that investigation," to request reimbursement for "those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of [the Act]." 28 U.S.C. § 593(f)(1). As this court has previously held, a successful petitioner must thus demonstrate that:

(1) he is a "subject" of such investigation;

(2) the fees were incurred "during" the investigation;

(3) the fees would not have been incurred "but for" the requirements of the Act; and

(4) the fees are "reasonable."

*In re North (Cave Fee Application),* 57 F.3d 1117, 1119 (D.C.Cir.1995) (per curiam). We will address each of these requirements in turn.

### A. "Subject" status

■ Berry, who was not indicted, argues that because IC diGenova closely scrutinized his conduct and told him that he was a subject, he clearly meets the Act's subject requirement. Neither the IC nor DOJ disputes Berry's subject status. Because IC diGenova clearly focused on Berry's possible criminal culpability in connection with the passport files search and the events surrounding it, we conclude Berry's conduct was within the scope of the IC's investigation and

that he knew his "conduct was within that scope in such a fashion that 'the independent counsel might reasonably be expected to point the finger of accusation' at him." *In re North (Shultz Fee Application),* 8 F.3d 847, 850 (D.C.Cir.1993) (per curiam) (quoting *In re North (Dutton Fee Application),* 11 F.3d 1075, 1078 (D.C.Cir.1993) (per curiam)). Accordingly, Berry qualifies as a subject under the Act.

■ On January 11, 1995, IC diGenova notified Berry by letter that he did not intend to seek charges against him. Berry argues that he remained a subject after this letter because it did not foreclose the possibility that new developments might prompt the IC to reevaluate his decision not to prosecute him. We conclude, however, that after IC diGenova notified Berry that he would not seek charges against him based on current information, Berry " 'did not remain under such reasonable apprehension of prosecution' " so as to continue his subject status for the remainder of IC diGenova's investigation. *In re Mullins (Mullins Fee Application),* 84 F.3d 459, 464 (D.C.Cir.1996) (per curiam) (quoting *In re North (Gadd Fee Application),* 12 F.3d 252, 256 (D.C.Cir.1994) (per curiam)). Accordingly, Berry may not recover attorneys' fees incurred after his attorney received and evaluated the January 11, 1995, letter, and we therefore will not allow fees incurred after January 12, 1995.

### B. Fees Incurred "During" the Investigation

■ Berry seeks fees for representation from December 15, 1992, to August 4, 1995. The court has identified the maximum time for which fees can be sought as spanning from the point in time when an IC begins an investigation of an individual through the deadline for filing comments to the final report. *See, e.g., In re Olson,* 884 F.2d 1415, 1420–22 (D.C.Cir.1989) (per curiam). The relevant time period in this case is from December 14, 1992, when IC diGenova was appointed, to the end of Berry's subject status, and from the May 5, 1995, notice that the Final Report was available to the August 4, 1995, deadline for filing comments to the

Report. Accordingly, we cannot allow the fees incurred after January 12 and before May 5, 1995.

## C. Fees Not Incurred "But For" the Requirements of the Act

■ In *In re Nofziger*, 925 F.2d 428 (D.C.Cir.1991) (per curiam), the court identified three circumstances under which the "but for" requirement of the Act was satisfied:

> First, the court has awarded fees in cases in which the subject is prejudiced by the Department of Justice's failure to comply with the substantial protective features of the Act. . . .
>
> Second, fees have been awarded because independent counsel's investigation constituted a substantial duplication of prior investigations. . . .
>
> Third, the court has awarded fees in two cases in which if the requirements of the Act, restricting the Attorney General's preliminary investigation, did not exist . . . the case could have been disposed of at an early stage of the investigation, without seeking appointment of independent counsel.

*Id.* at 438 (citations omitted). The IC and DOJ do not dispute that the fees would not have been incurred "but for" the requirements of the Act. As we concluded in *Mullins,* the circumstances surrounding the referral to DOJ by State and the Attorney General's limited investigative period satisfy the "but for" requirement of the Act. 84 F.3d at 465.

## D. Fees are "Reasonable" under the Act

■ Berry requests $256,145.25 in attorneys' fees based on three years of redacted attorneys' bills attached to his application. Commendably, Berry and his counsel have reduced his billing both by redaction of non-reimbursable items and apparently by some reduction for redundant or unproductive attorney time. We nonetheless will make further reductions, noting as we do so, the fee petitioner bears the burden of establishing all elements of his entitlement. *See, e.g., Shultz,* 8 F.3d at 850. As we have also previously observed, we do not in making

these reductions reflect upon the reasonableness of the billing as between a first-rate law firm and an affluent client. We rather apply the more stringent standard of whether the petitioner has met his burden of establishing that it is reasonable for the taxpayers to bear the expenditure in light of the intent of Congress in enacting the Ethics in Government Act. *See In re North (Bush Fee Application),* 59 F.3d 184, 189 (D.C.Cir.1995) (per curiam). With that in mind, we proceed to analyze Berry's submission.

■ Berry must demonstrate that his attorneys charged a reasonable rate and that the time they expended on his representation was reasonable. *See In re North (Gardner Fee Application),* 30 F.3d 143, 146 (D.C.Cir. 1994) (per curiam). Based on the affidavits and other exhibits submitted by Berry, we conclude that the hourly rates charged by his attorneys ($110–$400) and their paralegals ($75–$100) comport with prevailing community standards and are within the realm of reasonableness. *Id.* We also conclude that he has, for the most part, provided adequate descriptions and documentation of the work performed. *See National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982) (per curiam) (holding that a fee application must "contain sufficiently detailed information about the hours logged and the work done"). There are, however, various items that must be excluded or adjusted on the ground of reasonableness.

■ There are several items that we must exclude because they were not incurred in asserting Berry's defense against the IC's investigation and thus are not reimbursable under the Act. *See In re Meese,* 907 F.2d 1192, 1203 (D.C.Cir.1990) (per curiam). Specifically, Berry requests $575 in fees from appealing the DOJ's denial of representation and $2,810 in fees in connection with a trust fund and other fund raising matters. He also requests $441.25 for representation in connection with a General Accounting Office investigation. *See id.* (disallowing fees incurred in connection with other investigation). Berry also claims $385 arising from research regarding the possibility of filing a civil suit. Last, he seeks $148.75 for media

matters. *See id.* (disallowing fees for media activity as not reasonably related to defense of IC investigation). "[S]overeign immunity prevents the award of costs or fees against the United States, absent specific statutory authorization." *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1363 (D.C.Cir.1977). We have previously held that we must strictly construe the waiver of sovereign immunity found in section 593(f), *see In re Donovan*, 877 F.2d 982, 994 (D.C.Cir.1989) (per curiam), and that care must be taken to avoid enlarging a statute's waiver of immunity beyond what a fair reading of the statute requires. *In re North (George Fee Application)*, 62 F.3d 1434, 1436 (D.C.Cir.1994) (per curiam). Construing narrowly the waiver of sovereign immunity in section 593(f), we conclude that none of these activities was actually asserting Berry's defense against IC diGenova's investigation and thus deduct the fees they generated.

██ Berry filed in district court a successful motion to quash the IC's subpoena on the ground that it was based on illegal wiretapping of his phone calls at State. He now claims $34,415 in fees for the preparation of the motion, $34,442.50 in fees for preparation of the response to the IC's reply, and $10,440 in fees for preparation of a reply to the IC's supplemental memorandum on the motion. We find that Berry has failed to demonstrate the reasonableness of spending a total of $79,297.50[1] in connection with the motion to quash, and we will reduce by one-third the fees awarded in this matter, thus deducting $26,432.50 from Berry's request. *See American Petroleum Inst. v. EPA*, 72 F.3d 907, 915–16 (D.C.Cir.1996) (reducing fees for fail-ure to demonstrate reasonableness of time spent on motions).

██ We also note that on various occasions, several attorneys attended meetings of the joint defense group and we will deduct the fees of the lower-billing attorney for these meetings to avoid reimbursement for duplication of effort. *See Bush*, 59 F.3d at 190 (deducting fees for duplication of effort). The deductions for these fees total $1080. We will allow, however, the fees for two attorneys to attend Berry's interviews with the IC and for the hearing on the motion to quash. *See Mullins*, 84 F.3d at 469. We also deduct $226.25 in fees for document delivery by billing professionals. *See Bush*, 59 F.3d at 194 (deducting professional time billed for delivery of documents).

██ Last, we consider the $23,397.50 Berry claims for fees in connection with the Final Report. Berry was a central figure in the IC's investigation and therefore it is reasonable to expect that his attorneys would expend a substantial amount of time preparing his comments to the IC's Report. However, we conclude that Berry has not adequately justified the very large amount of time incurred in this connection. His comments to the Final Report concentrate overwhelmingly on criticism of State's investigation rather than IC diGenova's investigation, thus mainly reiterating the IC's thorough criticism of State's actions. Accordingly, we will reduce that portion of the award by one-half and deduct $11,698.75. *See Bush*, 59 F.3d at 195.

In sum, we make the following deductions from the total attorneys' fees requested by Berry:

| | |
|---|---|
| Attorneys' fees requested | $256,145.25 |
| Representation between 1/13/95 & 5/7/95 | $2,040 |
| DOJ denial of representation | $575 |
| Trust fund and fund raising | $2,810 |
| GAO investigation | $441.25 |
| Civil suit research | $385 |
| Media matters | $148.75 |
| Reduction for motion to quash | $26,432.50 |
| Duplication of effort | $1080 |
| Document delivery | $226.25 |

**1.** This amount does not include the fees incurred for preparing for and participating in the hearing on the motion before the district court, which we find reasonable.

| | | |
|---|---|---|
| Reduction for final report | $11,698.75 | |
| Total deductions | | $45,837.50 |
| Attorneys' fees awarded | | $210,307.75 |

█ Berry also seeks $6,069.79 in expenses for phone calls, postage, duplicating, facsimiles, cab fare, and computerized research incurred in connection with his representation during the investigation. All of these expenses are reasonable and we will award them in full.

### CONCLUSION

Based on the foregoing analysis, we will grant Berry's petition and award $210,307.75 for attorneys' fees and $6,069.79 for expenses, making a total award of $216,377.54.

*Judgment accordingly.*